**STATE of Missouri, Respondent,**

v.

**Christopher James WADEL, Appellant.**

**No. WD 74974.**

Missouri Court of Appeals,
Western District.

April 30, 2013.

Chris Koster, Attorney General, Jessica P. Meredith, Assistant Attorney General, Jefferson City, MO, for Respondent.

William J. Swift, Assistant Public Defender, Columbia, MO, for Appellant.

Before Division Two: ALOK AHUJA, Presiding Judge, and KAREN KING MITCHELL and GARY D. WITT, Judges.

KAREN KING MITCHELL, Judge.

Christopher J. Wadel (Wadel) appeals his convictions, following a jury trial, for two counts of first-degree statutory sodomy in violation of section 566.062, one count of first-degree statutory rape in violation of section 566.032, and two counts of first-degree child endangerment in violation of section 568.045.[1] Wadel claims that the evidence was insufficient to support his convictions of first-degree statutory sodomy and first-degree statutory rape due to a lack of corroborating evidence. Wadel also claims that the trial court plainly erred in instructing the jury on the two charges of child endangerment in that the instructions failed to describe the conduct forming the basis for the charges, thereby relieving the State of its burden to prove those elements to the jury. Because we find that there was sufficient evidence to

---

1. All statutory citations are to RSMo 2000, as updated through Cum.Supp.2009, unless otherwise noted.

support the convictions and that the trial court did not plainly err in instructing the jury, we affirm the convictions and sentences.

## Factual Background [2]

Beginning in July 2006, A.W. (Wadel's daughter, d/o/b 11/11/05) and C.W. (A.W.'s half-sister, d/o/b 9/27/04) began living with Wadel and his parents, Sue and Dave Wadel (who had obtained custody of the girls as co-guardians).[3] Wadel's girlfriend, Stephanie Hobbs, started living at Sue and Dave's house in early 2009. The girls' mother, Hazel Shimp, did not have contact with the girls from July 2006 until September 2009. From September 2009 until December 2010, Shimp had court-authorized visitation with the girls, and beginning in March 2010, she was allowed overnight weekend visitation. On May 8, 2010, when Shimp picked the girls up for a scheduled weekend visit, she noticed bruising on A.W. and reported it to the police, indicating that she suspected abuse. Both girls told Shimp that Wadel was mean to them and that Sue would not protect them from Wadel. The girls were taken into protective custody later in May 2010. Upon removal from Sue and Dave's custody, the children also ceased overnight visits with Shimp.

During the initial investigation into the reported abuse, Wadel, Sue, and Dave, all told Charles Delaney, a children's service worker, that they took care of A.W. and C.W., and that Wadel took care of the girls alone when Sue and Dave went to the hospital for Dave's regular appointments.

Cindy Wyant performed forensic interviews of both A.W. and C.W. on May 13, 2010. She interviewed the children initially regarding alleged physical abuse.[4] During the interviews, C.W. told Wyant that Wadel was mean and that she was scared. In the middle of A.W.'s interview, A.W. described an incident when she was hiding in the closet with Wadel and they played a game that she described as a monkey coming out of a cave; A.W. said that she was scared. A.W.'s statement raised a red flag in Wyant's mind, and thereafter, she focused the interview on uncovering possible sexual abuse. During a discussion about who should be told about inappropriate touching, A.W. indicated that she could not tell Wadel "because he's the one that touches [her] there." A.W. told Wyant that Wadel touched her vagina with his penis, that she had seen Wadel touch his penis with his own hand, and that something yellow came out of Wadel's penis.

C.W. told Christine Bohannon, A.W. and C.W.'s foster parent from May 13, 2010 until the end of June 2010, that Wadel "kisses her all over." Both girls told Bohannon that they feared Wadel. On one occasion, when Bohannon was getting A.W. and C.W. ready for bed, A.W. said that Wadel touched her private parts, indicating her genital area, and that it hurt. C.W. told Bohannon that Sue told Wadel to stop touching them. On another occasion, C.W. told Bohannon that her private area was hurting, and Bohannon observed that C.W.'s genital area was red and swollen. When Bohannon asked C.W. how it became red and swollen, C.W. "said that she was rubbing it and playing with it like

2. We view the evidence in the light most favorable to the verdict. *State v. Winfrey*, 337 S.W.3d 1, 3 (Mo. banc 2011).

3. Because there are multiple individuals involved in the case with the last name Wadel, Sue and Dave Wadel will be referred to by

their first names. No familiarity or disrespect is intended.

4. Because the alleged physical abuse is not at issue in this appeal, we do not discuss the facts that relate to those allegations.

[Wadel] does." C.W. told Bohannon that Wadel sometimes touched both her and A.W.'s pelvic area and buttocks, and that he would occasionally take them to the park and "touch[ ] them where he shouldn't." C.W. told Bohannon that Wadel put "[t]wo [fingers] in her bootie and it hurt[ ]," and Wadel put his tongue on her "down there," which she described as "yucky." C.W. said that she was not wearing pants when the touching occurred.

C.W. told Bohannon several times during the six weeks she was living at Bohannon's home that Sue told Wadel not to touch the girls anymore. She also told Bohannon that, to get away from Wadel, C.W. would hide in a doll house, under a tree, or in a closet, and that C.W. once picked A.W. up and carried her to a bedroom and locked the door to get away from Wadel. Bohannon recalled an incident when Bohannon's son exclaimed, "[t]here's daddy!" when his father arrived home. In response, A.W.'s eyes got big, she took off running, and calmed down only after Bohannon explained that it was A.W.'s foster father who had arrived. Bohannon had the children removed from her care after deciding that they were "too sexualized" based on the girls' inappropriate sexual behavior towards Bohannon's own children.

From mid-June 2010 until mid-December 2010, Jana Robinson served as a foster parent to A.W. and C.W. While the girls were in Robinson's care, C.W. underwent a sexual abuse forensic examination (SAFE exam) at the Children's Center, where she reported that she had been abused by Wadel. As the physician explained the purpose of the SAFE exam to C.W., C.W. said that the reason "it hurts is ... because [Wadel] is always pickin' on me down there."

On two or three other occasions while in Robinson's care, C.W. asked if the reason she could not visit her grandparents, Sue and Dave, was because Wadel had hurt her and her sister. Additionally, two times while the girls were playing together, Robinson caught C.W. "over" A.W. with A.W.'s underwear pulled down and her dress pulled up. The first time, Robinson told C.W. that it is not appropriate to play like that or to touch other people's private parts. The second time, she again told C.W. that it was inappropriate to touch other people's private parts, to which C.W. responded, "Like [Wadel]?"

Mary Hymer, a foster parent who provided respite care for A.W. and C.W. while Robinson and her family were on a trip, testified that, on the first night the girls were in her care, C.W. offered, "out of the blue," that Wadel "had touched her pee pee and that he had squeezed her neck real tight [with both of his hands]." At the time, Hymer was not aware of any of the allegations against Wadel.

Dr. Trisha Bridgewater, a clinical psychologist, had six sessions with A.W. while A.W. was living in foster care. During a session on June 29, 2010, A.W. said that "[Wadel] is mean." A.W. told Dr. Bridgewater that Wadel "touch[ed] [her] front bottom and [her] back bottom," indicating that her vagina was her "front bottom." A.W. further disclosed that Wadel used his hand, specifically his index finger, and that "[h]e put it in in a bad way." A.W. indicated that she was not wearing clothes when the abuse occurred, that she did not like what Wadel did to her, that it hurt, and that Wadel was not supposed to do it. A.W. said that the abuse occurred in the bedroom in "the white house." A.W. also told Dr. Bridgewater that she touched Wadel's penis, which she referred to as his "front bottom." A.W. said that Sue and Dave knew about the abuse because C.W. told Sue about it, and, in response, Sue and Dave told the girls: "You hide in [the]

closet. Don't go to [the] white house." Dr. Bridgewater understood from her sessions that A.W. and C.W. had lived with Sue and Dave, and that Wadel had lived in a white house near Sue and Dave's. Tiffany Essenpries, a children's service worker with the Bates County Children's Division, understood that, at times, Wadel lived up the hill from Sue and Dave, on the same piece of property. Sue and Dave said that there was a white house across the road from their house, but it was abandoned, did not have floors, and was always locked.

At a session on July 6, 2010, A.W. volunteered that she had seen Sue and Dave and that they told her they missed her. A.W. then asked Dr. Bridgewater: "Did you know what happened at Sue and Dave's?" When Dr. Bridgewater said she did not know, A.W. told her that she and C.W. hid in the closet. When asked why they hid, A.W. told Dr. Bridgewater: "[Wadel] hurt us. We see him coming and Sue say 'hide in [the] closet.'" A.W. said they would hide when they saw Wadel, and, if they did not hide, then they "had to go to the white house." When Dr. Bridgewater asked A.W. if she remembered their conversation from the last session, A.W. said that she did not want to talk about it.

At the next session, on July 13, 2010, A.W. told Dr. Bridgewater: "[Wadel] is bad," but she was not supposed to tell. A.W. told Dr. Bridgewater that she was telling the truth, that she had not stretched the truth at all, and that no one told her what to say. A.W. also said that Sue and Dave would be mad at her for telling Dr. Bridgewater because they had told her "[n]ot to tell that [Wadel] is bad" and to "[g]o to the closet."

During the sessions with A.W., Dr. Bridgewater looked for reliability factors, such as age-inappropriate sexual knowledge, child appropriate terminology, emotional responses, and whether there was a reason for A.W. to fabricate the information. Dr. Bridgewater noted that A.W. demonstrated several indicia of reliability, including age-appropriate terminology and specific sensory details of events (specifically that Wadel moved his finger when he touched her, that it "tickled," and that his penis moved when she touched it).

Dr. Bridgewater had seven sessions with C.W. C.W. used the terms "hoochie" for penis and "front bottom" for vagina. C.W. told Dr. Bridgewater that she did not like Wadel, who she referred to as her brother. C.W. said that Wadel "touched [her] in a bad way," and that Sue told Wadel to stop, but he did not. C.W. said that Wadel touched her "front bottom" with his "hoochie," that "[h]e put his hoochie in there," that he "punched [her] in the belly," and that it hurt. C.W. indicated that she was not wearing clothes when Wadel touched her, that she did not want him to touch her like that, and that she did not like it. C.W. said that the abuse happened in the bedroom in the "white house" and that she wanted Wadel to stop, but he would not. C.W. also told Dr. Bridgewater that she went to the white house "a lot." When asked if she remembered smelling anything when the abuse occurred, C.W. said there was something that Wadel got out and that, "[i]t was clear stuff. It was smooshie." C.W. told Dr. Bridgewater that she was telling the truth, that she had not stretched the truth at all, and that no one told her what to say.

During the next session, C.W. volunteered that she had seen Sue and Dave and that they told her they missed her and loved her. C.W. said that she told them she missed them and that she will get to go home. C.W. next told Dr. Bridgewater that what she said at the last session, about what Wadel did to her, did not actually happen; after this disclosure, Dr. Bridgewater ended the session.

At the following session, Dr. Bridgewater asked C.W. about her comment that the abuse did not actually happen, to which C.W. responded: "Yeah. I did say that. But it did happen." C.W. said she was scared and that was why she said it did not happen. When Dr. Bridgewater told C.W. that she cared only about the truth, C.W. replied: "[Wadel] put his hoochie on my front bottom. It hurt." C.W. said that she tried to run away and that she knew that if she went to the white house, "it would happen."

C.W. said that Sue and Dave knew what was happening in the white house because she told them what Wadel did to her. After she told Sue, C.W. said Sue was mad and yelled at Wadel. Sue told C.W. not to go to the white house and that, if Wadel came to Sue and Dave's house, C.W. was to hide in the closet and act like she was not home. C.W. reiterated that "he did bad" at the white house and that she did not want to go there again. C.W. said she was telling the truth. C.W. also told Dr. Bridgewater that she just wanted it to stop and that "Dee"[5] told her to tell the truth. C.W. also demonstrated several indicia of reliability, including the unusual information she provided (specifically, that she described the act as being punched in the belly), that she told him to stop, that she described the context of what happened, and that she gave a physical description of what Wadel did to her.

Dr. Bridgewater testified that she believed both girls were being truthful when they told her about the sexual abuse.[6] When asked on cross-examination if it was possible that they were also telling Lori Ruddick, another psychologist they saw, the truth when they later said the abuse did not happen, Dr. Bridgewater respond-ed that children often recant, that recant-ing is not at all unusual, and that children recant one out of five times in similar situations. Dr. Bridgewater noted that the oddest thing about C.W.'s recantation in her office was that it occurred after she saw Sue and Dave, and that one week later, C.W. again provided an account confirming that the sexual abuse occurred.

Jama Bogart, a family nurse practitioner and SAFE examiner, examined C.W. on June 21, 2010. C.W.'s exam "was basically normal until [she] got down to the vaginal area," where she found two "notches" at the hymen and scarring on the labia majora. In her report, Bogart noted that the physical findings were inconclusive for abuse. Bogart also noted that the notches and scarring could have been caused by other activities, such as horseback riding or jumping on a trampoline.

Tiffany Essenpries provided case management services to A.W. and C.W. after they were removed from the Wadel home and taken into custody. Although her job was not to question the children about alleged abuse, she always documented any statements made in her presence on the subject. On June 8, 2010, while leaving a scheduled visit with Wadel and his parents, C.W. said "sometimes, [Wadel] touches my pee pee, . . . but I don't want him to," and she said it hurt when he touched her. Essenpries accompanied C.W. to the June 21, 2010 SAFE exam, where C.W. asked if the examiners knew why it hurt "down there," referring to her vaginal area, and then said it hurt "because [Wadel] keeps picking on it" and asked if they could tell him to stop.

The girls were eventually returned to Sue and Dave's care on December 22, 2010. The following October, Sue brought

---

5. "Dee" is the name that A.W. and C.W. call their biological mother, Hazel Shimp.

6. Wadel did not challenge the admission of this testimony.

A.W. and C.W. to Children's Mercy Hospital to be assessed for urinary tract infections. Before taking the girls to the hospital, Sue had taken them to a clinic near her home, where C.W. was diagnosed with a yeast infection. Sue said she took the girls to the hospital because she wanted a second opinion on whether they had been sexually abused. Mindy Schneider, a social worker at the hospital, was involved in the assessment. Sue told Schneider, who had no knowledge of any sexual abuse allegations, that Sue believed Shimp's fiancé was sexually abusing the girls. Sue made several inappropriate comments in front of the girls during the appointment, including adamant denials that Wadel had done anything to the children, accusations of abuse against Shimp's fiancé, accusations against Shimp of selling her food stamps for drugs, and statements that Wadel was then incarcerated for sexually abusing the girls. Schneider told Sue several times not to discuss certain things in front of A.W. and C.W. Sue also insisted that the doctors perform a vaginal exam of the girls to determine if they had been sexually abused. Because the hospital did not perform SAFE exams and the girls were brought in for an assessment of urinary tract infections, a vaginal exam was not performed.

Immediately after the hospital visit, Schneider and the doctors discussed calling the child abuse hotline to report Sue's behavior, but ultimately decided not to hotline the incident. However, Schneider did report the inappropriate comments to Essenpries, along with her concern that Sue may not be able to protect the girls from their alleged abuser. After the hospital visit, Sue called the hospital multiple times, insisting that they release information from the SAFE exam showing that the girls had not been sexually abused. Because no SAFE exam had been performed and no such information existed from the October 2011 visit, Schneider contacted the child abuse hotline to document her concerns with Sue's behavior.

Lori Ruddick, a licensed psychologist, first became acquainted with A.W. and C.W., as well as Sue and Dave, in April 2010, when she performed a bonding assessment at Sue and Dave's request. Ruddick concluded that both A.W. and C.W. had very close relationships with Sue and Dave. In the bonding assessment, the girls referred to Sue and Dave as their mom and dad. Both girls told Ruddick that Wadel lived "up the hill" from Sue and Dave.

Ruddick's next interaction with A.W. and C.W. was in November 2010, when she was referred by Essenpries to conduct follow-up therapy with the girls individually. She then saw A.W. and C.W. from January 21, 2011, up until the date of the trial, which began in late November 2011. Ruddick's role with the girls was not to investigate the sexual abuse allegations, but only to provide therapy. Sue and Dave brought A.W. and C.W. to all of their visits with Ruddick.

At a session in January 2011, the first thing C.W. said to Ruddick was, "I want to tell you about [Wadel]. I lied before, he didn't touch me. Dee [Shimp] started that and took me to the health department. And I told them that [Wadel] touched me on the bottom. I was thinking about it and I couldn't get it out of my brain." Ruddick asked C.W. why she was telling her this, and C.W. said, "I don't know." Ruddick believed that C.W. had been coached to recant. Thereafter, C.W. consistently told Ruddick that she had lied in her previous allegations regarding Wadel's sexual abuse. Because C.W. consistently, and spontaneously, told Ruddick, for a period of nine to ten months, that she lied about the allegations, Ruddick changed

her opinion and came to believe the recantations to be genuine. C.W. told Ruddick, without prompting, that she was sad that Wadel was in jail, that she had lied about what he did to her, and that he had spanked her but was not allowed to "wash her privates" because her mom did that. C.W. also said that Wadel spanked her a lot, at least once with a belt, because she was getting into trouble, but he did not mean to hurt her. Additionally, C.W. volunteered that "[w]e got this out of our head now when I didn't want to go to foster care," and that "Sue and Dave didn't tell me this."

Before a session in February 2011, Sue asked to speak with Ruddick and informed Ruddick, privately, that she had discovered both girls in a room with their pants down, and when she asked what they were playing, they said they were "playing hoochie and kissing hoochie." Ruddick questioned C.W. about the incident, and C.W. said that A.W. wanted to "play sex." In response, C.W. said that she told A.W., "No, mom will spank our butts. I don't want to talk about it. If I talk about it, I will do it again. And I'm going to my friend's house and I don't want to do it over there. They will kick me out." C.W. told Ruddick that a girl named "Alexis" taught her how to "play sex."[7] Ruddick acknowledged that acting out sexually can be a sign that a child has suffered sexual abuse. C.W. also said: "Now, I want to tell you about [Wadel]. He's my brother and I don't want him to be hurt and lonely because of all my lies." At another February 2011 session, without prompting, C.W. said:

> I'll tell you the truth. When I was at Dee's she was suppose to be taking me to the gas station to meet Sue and Dave;

but, instead, she took me to this place and told me to lie about bottom parts. I didn't want to, but she yelled at me told me to. So I was—and so I was so scared and frightened, so I did. I need to get, my brother [Wadel], out of jail.

In early March 2011, C.W. was becoming very aggressive toward A.W.; she was throwing daily tantrums, she threatened to kill Dave with a "knife to the heart," and she threatened to get a chainsaw and cut Sue's head off. C.W. showed no remorse for her behavior. At one point during the sessions with Ruddick, C.W. also mentioned suicide. Ruddick testified that she believed C.W. was capable of lying, and that, in one session, she caught C.W. in a lie about her behavior, and when confronted, C.W. admitted that she had made it up and lied to Ruddick.

At the end of an early April 2011 session, C.W. said she was sad because she and A.W. got Wadel in trouble; she also said that she lied because Dee told her to and that she was scared of Dee. Also in April 2011, however, C.W. told Ruddick she had not seen Dee, and then she said: "I'm sad. She's just not coming." C.W. told Ruddick multiple times that Dee had told her to lie about Wadel. Throughout her sessions in the summer and fall of 2011, C.W. made additional statements that she missed Wadel, that she wanted to get him out of jail, and that he was in jail because she got him in trouble.

Ruddick also had sessions with A.W. Ruddick reported that A.W. was not very talkative and was very guarded, but that they would frequently engage in play therapy during her sessions. A.W. did like to "tell on her sister a lot," and Ruddick noted that the girls had anger issues to-

---

**7.** It appears that Alexis was a child at the daycare that A.W. and C.W. attended when they were in foster care.

wards each other. A.W. had a speech delay, and Ruddick diagnosed A.W. with oppositional defiant disorder. A.W. did not volunteer any information regarding sexual abuse. However, when Ruddick asked A.W. if Wadel had ever touched her private areas, A.W. shook her head to indicate "no." When asked if she wanted to see Wadel, A.W. again shook her head to indicate "no."

A.W. and C.W. both testified twice during the trial, once for the State and once for the defense. A.W., who was six years old and in kindergarten at the time of the trial, told the court that she did not know what a lie was. But she also told defense counsel that she was telling the truth. A.W. testified that Wadel was her father, that she was not afraid of him, and that she loved him. A.W. testified that when Wadel was living with Sue and Dave, they all lived in the same house. A.W. testified that Wadel never touched her private parts.

C.W., who was seven years old and in the first grade at the time of the trial, testified that Wadel is her brother, and that she, A.W., Sue, Dave, and Wadel all lived in the same house. C.W. testified that she has a bicycle, a trampoline, and horses at Sue and Dave's house. C.W. said that she loved Wadel, that she was not afraid of him, and that she never had to run and hide when she saw him. C.W. testified that Wadel never touched her private parts when she lived with Sue and Dave. She further testified that she lied about what Wadel did and that she was sorry for lying.

At trial, Sue admitted that, at the October 2011 doctor visit, she told Schneider that Wadel had not sexually abused the girls, but she denied making any statements to Schneider regarding her belief that Shimp's fiancé had done so. Sue testified that she did not believe the girls were sexually abused by Wadel or by Shimp's fiancé; she testified that she did not believe the girls were sexually abused by anyone.

Sue testified that Wadel had never changed their diapers, bathed them (or was around when they were bathed), or taken the girls to the park. She said that the only activity Wadel engaged in with the girls was taking them horseback riding. Sue further said that, between January 1, 2010, and May 10, 2010, Wadel was never alone with the girls, at home or elsewhere. Sue denied telling anyone from the Division of Family Services that Wadel took care of A.W. and C.W. when Dave had to go in for his regular doctor appointments, and she also said that, if Wadel was ever with the girls, they were not alone because his fiancé was always with him.

Dave testified that Wadel would sometimes discipline the girls with timeouts or spankings, but he also noted that Wadel did not spend a lot of time with the girls. Dave said that Wadel took care of the girls alone "a time or two," but that it was very seldom and that Wadel's girlfriend was with Wadel most of the time. Wadel's girlfriend, Stephanie Hobbs, said that there was never a time when she was apart from Wadel, except when he was working.

Wadel moved for judgment of acquittal at the close of the State's evidence and again at the close of all of the evidence. Both motions were overruled. Wadel was convicted by a jury of two counts of first-degree statutory sodomy, one count of first-degree statutory rape, and two counts of first-degree child endangerment. Wadel was sentenced to ten years on each of the sexual offenses and seven years on each count of child endangerment, with all sentences to run concurrently. This appeal follows.

## Analysis

Wadel raises five points on appeal. In his first three points, he claims that the trial court erred in denying the motion for judgment of acquittal as to the convictions of two counts of first-degree statutory sodomy of A.W. and one count of statutory rape of C.W., in that there was insufficient evidence to support the convictions because both A.W. and C.W. testified at trial that Wadel did not commit the acts, and there was no evidence presented to corroborate their out-of-court statements to the contrary. In his last two points, Wadel claims that the trial court plainly erred when it submitted Instructions 15 and 17, the verdict directors on the charges of first-degree child endangerment, to the jury. Wadel argues that, in failing to describe the conduct constituting "sexual contact" with A.W., Instruction 15 relieved the State of its burden to prove the element of "sexual contact." Wadel argues that Instruction 17 was likewise deficient in failing to describe the conduct that "created a substantial risk to the life or health" of C.W. and thereby relieved the State of its burden to prove the element of a substantial risk to C.W.'s life or health.

## I. Sufficiency of the Evidence and Application of the Corroboration Rule

Wadel claims that there was insufficient evidence to support his convictions of first-degree statutory sodomy of both victims and first-degree statutory rape of C.W. in that, at trial, both girls recanted their prior allegations, and their out-of-court statements implicating Wadel were not probative, absent corroboration. Put simply, Wadel's argument is that a child victim's out-of-court statements alone are insufficient, without corroboration, to support a sexual offense conviction in the face of the victim's trial testimony recanting the prior allegations. We disagree.

## Standard of Review

In a challenge to the sufficiency of the evidence, appellate " 'review is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.' " *State v. Miller,* 372 S.W.3d 455, 463 (Mo. banc 2012) (quoting *State v. Letica,* 356 S.W.3d 157, 166 (Mo. banc 2011)). "We accept as true all evidence favorable to the State, including all favorable inferences drawn therefrom, and disregard all evidence and inferences to the contrary." *State v. Thompson,* 314 S.W.3d 407, 410 (Mo.App. W.D.2010).

" 'This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any reasonable fact-finder could have found the essential elements of the crime beyond a reasonable doubt.' " *Miller,* 372 S.W.3d at 463 (quoting *State v. Nash,* 339 S.W.3d 500, 509 (Mo. banc 2011) (internal quotations and citations omitted)). " 'A jury may believe all, some[,] or none of a witness'[s] testimony, and the jury must resolve any contradictions or conflicts in that testimony.' " *Thompson,* 314 S.W.3d at 410 (quoting *State v. McMellen,* 872 S.W.2d 508, 510 (Mo.App. W.D.1994)). This Court "does not act as a 'super juror' with veto powers," but instead, "gives great deference to the trier of fact." *Miller,* 372 S.W.3d at 463.

### Sufficiency of the Evidence

■ A person commits first-degree statutory sodomy "if he has deviate sexual intercourse with another person who is less than fourteen years old." § 566.062.1. Deviate sexual intercourse is defined as:

any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however

slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person. . . .

§ 566.010(1).

A person commits first-degree statutory rape "if he has sexual intercourse with another person who is less than fourteen years old." § 566.032.1. Sexual intercourse is defined as "any penetration, however slight, of the female sex organ by the male sex organ, whether or not an emission results." § 566.010(4).

In the present case, both victims testified at trial that Wadel did not touch them as alleged, thus recanting their previous accusations. Despite their recantations, however, multiple out-of-court statements made by the girls, describing sexual abuse by Wadel, were admitted as substantive evidence at trial pursuant to section 491.075.1. C.W. made statements to Bohannon, Robinson, Hymer, Dr. Bridgewater, Essenpries, and Ruddick, indicating that Wadel sexually abused her by inserting his penis into her vagina and touching her vagina with his hands. A.W. made statements to Wyant, Bohannon, and Dr. Bridgewater, indicating that Wadel sexually abused her by touching her vagina and bottom with his hand and making A.W. touch his penis. All of these witnesses testified at trial about C.W. and A.W.'s prior out-of-court statements.

In addition to the admission of multiple out-of-court statements by the victims regarding Wadel's sexual abuse, there was other evidence supporting the State's allegations. Robinson, Bohannon, and Ruddick all testified regarding various incidents where the girls displayed inappropriate sexual behavior. Further, there was evidence that the victims feared Wadel. Finally, C.W.'s SAFE examination results, although inconclusive for abuse, showed notches at the hymen and scarring on the labia majora.

This evidence was sufficient to support Wadel's convictions of first-degree statutory sodomy and first-degree statutory rape.

## The Corroboration Rule and the Destructive Contradictions Doctrine

Wadel argues that, because the victims recanted at trial, their prior out-of-court statements required corroboration before the case could go to the jury. Setting aside the fact that the victims' prior out-of-court statements were *not* the only evidence indicative of guilt, we disagree with the basic premise of Wadel's argument. To fully explain our rationale, we must discuss the history and distinctions between the corroboration rule and the destructive contradictions doctrine.

Both rules find their genesis in sexual offense cases, where the testimony of the victim was considered highly suspect, based upon " '[t]he admonition of Lord Hale that it must be remembered that this is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent.' " *State v. Peters*, 186 S.W.3d 774, 780 n. 4 (Mo.App. W.D.2006) (quoting *State v. Goodale*, 210 Mo. 275, 109 S.W. 9, 11 (1908)). But the rules have branched apart, and though similar, are no longer one and the same.

The corroboration rule is more properly referred to as the corroboration exception to the general rule that "in sexual offense cases[,] the victim's testimony alone is sufficient to sustain a conviction, even if uncorroborated." *State v. Sprinkle*, 122 S.W.3d 652, 666 (Mo.App. W.D. 2003). This exception applies *only* where the victim's trial testimony is "in conflict with physical facts, surrounding circumstances, and common experiences [such] that its validity is doubtful." *Peters*, 186

S.W.3d at 778 (quoting *Sprinkle,* 122 S.W.3d at 666). This exception does not apply "'merely because the testimony of the victim includes inconsistencies or contradictions as to minor points of a nonessential nature [because c]onflicts of a nonessential nature and issues regarding the credibility of witnesses are matters for the jury to determine.'" *State v. Perdue,* 317 S.W.3d 645, 651 (Mo.App. S.D.2010) (quoting *State v. Paxton,* 140 S.W.3d 226, 230 (Mo.App. S.D.2004)); *see also State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995) (inconsistencies in trial testimony, even as to essential elements, do not suffice to invoke the corroboration exception absent any conflict with physical facts, surrounding circumstances, and common experience).

The destructive contradictions doctrine, on the other hand, "'provides that a *witness's testimony* loses probative value when his or her statements *at trial* are so inconsistent, contradictory, and diametrically opposed to one another that they rob the testimony of all probative force.'" *State v. Uptegrove,* 330 S.W.3d 586, 590 (Mo.App. W.D.2011) (quoting *State v. Goudeau,* 85 S.W.3d 126, 132 (Mo. App. S.D.2002)). Like the corroboration exception, the destructive contradictions doctrine has very limited application. It "does not apply to 'contradictions as to collateral matters, or to inconsistencies not sufficient to make the testimony inherently self-destructive.'" *Uptegrove,* 330 S.W.3d at 591 (quoting *State v. Wright,* 998 S.W.2d 78, 81 (Mo.App. W.D.1999)). "Likewise, the doctrine does not apply where the victim's statements are inconsistent with those of other witnesses," *id.* at 592, or "to contradictions between the victim's trial testimony and prior out-of-court statements." *Wright,* 998 S.W.2d at 81. "The doctrine is *not* a corroboration rule...." *State v. Case,* 140 S.W.3d 80, 92 (Mo.App. W.D.2004). And, unlike the corroboration exception, the destructive contradictions doctrine is no longer limited to cases involving sexual offenses. *See id.* at 91–92.

While both doctrines apply to claims of insufficient evidence, and both are premised upon contradictions and *inconsistencies,* the basis for the conflicts at issue differs. With the corroboration exception, the inconsistencies at issue arise between the stated allegations and known physical facts, surrounding circumstances, or common experiences; whereas the destructive contradictions doctrine requires the inconsistencies to arise within the statements made during the trial testimony of a single witness.[8]

---

8. The continued validity of both the corroboration rule and the destructive contradictions doctrine may be ripe for reexamination. *See Peters,* 186 S.W.3d at 780 n. 4 (questioning the need for a corroboration rule); *Silvey,* 894 S.W.2d at 673 (rejecting application of destructive contradictions doctrine to the trial testimony of a child victim of a sexual offense, and holding that "inconsistent or contradictory statements by a young child relating a sexual experience does not, in itself, deprive the testimony of all probative force"); *State v. Nelson,* 818 S.W.2d 285, 289 (Mo.App. E.D. 1991); *State v. Platt,* 496 S.W.2d 878, 881 (Mo.App.1973). As the *Peters, Nelson,* and *Platt* decisions note, it appears that the Missouri Supreme Court long ago did away with the notion of treating victims in sexual offense cases any different from those in any other criminal case. *State v. Barnes,* 325 Mo. 545, 29 S.W.2d 156, 158 (1930) (holding that "[n]o sufficient reason appears why a rape case should stand on any different ground from any other case in respect to the sufficiency of the evidence to make a case for the jury"). The Court further held: "An appellate court should not usurp the proper functions of the trial court and jury and set the conviction aside merely because it may disagree with the jury as to the truthfulness of the story told by the prosecutrix, or think the trial court should have set the verdict aside as against the weight of the evidence." *Id.*

Here, though Wadel cites to and relies on cases involving the corroboration exception, he fails to identify a single aspect of either victim's allegations that could be considered to be in conflict with physical facts, surrounding circumstances, or common experiences. *See, e.g., Peters,* 186 S.W.3d at 778 (where defendant sought to invoke the corroboration exception in response to the victim's testimony about sexual abuse occurring in seemingly impossible body positions, and in situations where surrounding circumstances indicated that the abuse would have been doubtful). Thus, he has failed to demonstrate the basic premise for invoking the corroboration exception. Consequently, the general rule applies, meaning that the victims' allegations, alone, in the absence of corroboration, were sufficient to sustain his convictions.

Because Wadel's argument is premised upon the victims' recantations at trial, it seems that what he's truly relying on is the destructive contradictions doctrine and the fact that the victims offered inconsistent accounts of Wadel's conduct. But, as discussed above, the destructive contradictions doctrine applies only to contradictory trial testimony, not "to contradictions between the victim's trial testimony and prior out-of-court statements." *Wright,* 998 S.W.2d at 81. As these are the only inconsistencies upon which Wadel relies, and they are not sufficient to invoke the destructive contradictions doctrine, his argument is without merit.

Wadel appears to be advocating a third theory, distinct from either the corroboration exception or the destructive contradictions doctrine, wherein corroboration of a victim's allegations would be required any time the victim subsequently recants at trial. In making his argument, Wadel relies extensively on *State v. Pierce,* 906 S.W.2d 729, 735–36 (Mo.App. W.D.1995).[9]

In *Pierce,* this Court found that the fourteen-year-old victim's *single* uncorroborated out-of-court statement, indicating that she had sexual intercourse with the forty-one-year-old defendant—a statement she later recanted at trial—was insufficient to support the defendant's statutory rape conviction. *Id.* Despite her earlier statement, at trial, the victim denied ever having sexual intercourse with the defendant. *Id.* at 732. And, by the time the case came to trial, all other witnesses supporting the allegations had recanted as well. *Id.* at 735. This Court found that corroboration was necessary because the

---

Indeed, it may be difficult to imagine a case where, consistent with our standard of review for sufficiency of the evidence, we could reverse a conviction premised upon nothing more than inconsistencies (either in testimony or with known physical facts) described by the complaining witness. "[I]t is the exclusive province of the jury to pass upon the truth of [a witness's] story." *Id.; see also Peters,* 186 S.W.3d at 780 n. 4 ("Certainly, corroboration can be important in any case, notably those involving only two witnesses: the victim and the accused.... But we see no reason for a 'corroboration rule' as such. The guideposts used in other cases regarding the sufficiency of evidence would seem to be sufficient. Inconsistencies affecting credibility are for the trier of fact to resolve.").

Given both the nature of their creation and their limited application, these rules may be nothing more than vestiges of the antiquated and biased notion that women and children are not credible witnesses in sexual offense cases.

9. The State suggests that *Pierce's* holding may warrant reexamination. As a narrow application of the corroboration rule limited to the specific facts of that case, we are confident that the holding in *Pierce* will continue to be properly applied, and distinguished when necessary, on a case-by-case basis. *See, e.g., State v. Benwire,* 98 S.W.3d 618, 623 n. 1 (Mo.App. W.D.2003); *State v. Porras,* 84 S.W.3d 153, 160–61 (Mo.App. W.D.2002); *State v. Archuleta,* 955 S.W.2d 12, 14–15 (Mo. App. W.D.1997).

victim recanted at trial on an essential element of the alleged offense, there was no physical evidence, and "the surrounding circumstances and common experience [did] not support the allegation of sexual intercourse." *Id.* at 734–35.

Wadel's reliance on *Pierce* is misplaced. First, *Pierce* is a corroboration exception case; thus it has no application to Wadel's claim. Second, "[t]he rule set forth in *Pierce* is ... to be applied [only] to its 'unique factual situation.'" *State v. Johnson,* 262 S.W.3d 257, 259 (Mo.App. W.D. 2008) (quoting *State v. Duley,* 219 S.W.3d 842, 844 (Mo.App. W.D.2007)). Here, the facts are vastly different from those in *Pierce;* thus, it does not apply. Finally, *Pierce* does not stand for the proposition that corroboration is required in every sexual offense case where the victim subsequently recants. And to the extent that it could be so read, it would be contrary to section 491.074 (allowing for the admission of prior inconsistent statements as substantive evidence), Missouri Supreme Court case law, *see State ex rel. Amrine v. Roper,* 102 S.W.3d 541, 549 (Mo. banc 2003) (contemplating the possibility, in light of section 491.074, that sufficient evidence to sustain a conviction could be based upon recanted evidence); and the standard of review applicable to sufficiency of the evidence cases.

In short, Wadel fails to invoke either the corroboration exception or the destructive contradictions doctrine, and we reject his invitation to recognize a further exception, mandating corroboration in the face of recanted testimony. And, because there was sufficient evidence presented at trial from which a rational juror could conclude beyond a reasonable doubt that Wadel committed the crimes charged, we affirm his convictions.

## II. Instructional Error

Wadel's last two points on appeal raise claims of instructional error related to his convictions for two counts of first-degree child endangerment.

### Standard of Review

 Wadel claims that the trial court erred in instructing the jury on both counts of first-degree child endangerment, but he concedes that he did not object to either of the verdict directors. Thus, he requests plain error review. Plain error review entitles Wadel to reversal only if he can demonstrate that the trial court erred, and that the error was so substantial that it resulted in manifest injustice or a miscarriage of justice. *State v. Cook,* 339 S.W.3d 523, 527 (Mo.App. E.D.2011). " 'Instructional error constitutes plain error when it is clear the trial court so misdirected or failed to instruct the jury that it is apparent the error affected the verdict.' " *Miller,* 372 S.W.3d at 470 (quoting *State v. Beeler,* 12 S.W.3d 294, 300 (Mo. banc 2000)).

 " 'The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review.' " *State v. Smith,* 157 S.W.3d 687, 692 (Mo.App. W.D.2004) (quoting *State v. Hagan,* 113 S.W.3d 260, 267 (Mo.App. W.D.2003)). " 'It is well-established law that instructional error rarely rises to the level of plain error.' " *State v. Davies,* 330 S.W.3d 775, 788 (Mo.App. W.D.2010) (quoting *State v. Bowman,* 311 S.W.3d 341, 348 (Mo.App. W.D.2010)). Because the instructional error did not prejudice Wadel, let alone cause manifest injustice or a miscarriage of justice, he is not entitled to relief under the plain error standard of review.

**It is error for a court to give a verdict director that violates MAI–CR or the Notes on Use.**

 Wadel was charged with one count of first-degree child endangerment as to

each victim. As to A.W., Wadel was charged under section 568.045.1(2), which provides, in pertinent part, that a person commits first-degree child endangerment if "[t]he person knowingly engages in sexual conduct with a person under the age of seventeen years over whom the person is a parent, guardian, or otherwise charged with the care and custody." The applicable Missouri Approved Instruction, MAI–CR 3d 322.10 (endangerment by sexual conduct), provides:

> (As to Count ____, if) (If) you find and believe from the evidence beyond a reasonable doubt:
>
> First, that (on) (on or about) [*date*], in the (City) (County) of _____, State of Missouri, the defendant engaged in [*Describe conduct.*] with [*Identify child.*], and
>
> Second, that this conduct constituted (sexual intercourse) (deviate sexual intercourse) (sexual contact),[10] and
>
> Third, that [*Identify child.*] was then less than seventeen years of age, and
>
> Fourth, that the defendant was the (parent) (guardian) ( [*Describe other relationship in which the defendant was charged with the care and custody of the child.*] ) of the child, and
>
> Fifth, that the defendant acted knowingly with respect to the facts and circumstances submitted in this instruction,
>
> . . . .

> then you will find the defendant guilty (under Count ____) of endangering the welfare of a child in the first degree.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
>
> . . . .

Instruction 15, the verdict director for child endangerment of A.W., directed the jurors to find, among other facts not at issue in this appeal, the following:

> First, that on or about the month of May 2010, in the County of Bates, State of Missouri, the defendant knowingly engaged in *sexual contact* with [A.W.], and
>
> Second, that this conduct constituted *sexual contact.* . . .

(Emphasis added.) Thus, the instruction did not describe the conduct that allegedly constituted sexual contact, a necessary element of the charged offense, other than by stating that Wadel engaged in "sexual contact" with A.W.

As to C.W., Wadel was charged under section 568.045.1(1), which provides, in pertinent part, that a person commits first-degree child endangerment if he "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." The applicable Missouri Approved Instruction,

---

**10.** MAI–CR 3d 322.10 Notes on Use provide that when the terms "deviate sexual intercourse" or "sexual contact" are used in the child endangerment instruction, they must be defined. When one of these terms appears in more than one instruction, the definition is to be set out in a separate instruction. *See* MAI–CR 3d 322.10 Notes on Use 5. Here, as noted, *infra*, "deviate sexual intercourse" and "sexual contact" were defined in Instruction 6. The term "sexual intercourse," however, if used in a child endangerment instruction or in a statutory rape instruction, "may be defined by the court on its own motion and must be defined upon written request in proper form by the state or by the defendant." MAI–CR 3d 322.10 Notes on Use 5(d); MAI–CR 3d 320.03 Notes on Use 8(c). In the present case, the statutory rape charge was based upon an allegation that Wadel had "sexual intercourse" with C.W. The court did not provide a definition of "sexual intercourse" on its own motion, and neither the State nor Wadel requested a definition; thus, no definition of "sexual intercourse" was provided to the jury.

MAI–CR 3d 322.10 (endangerment by substantial risk), provides:

> (As to Count ___, if) (If) you find and believe from the evidence beyond a reasonable doubt:
>
> First, that (on) (on or about) [*date* ], in the (City) (County) of ___, State of Missouri, the defendant [*concise statement of defendant's conduct* ], and
>
> Second, that in so doing, the defendant created a substantial risk to the (life) (or) (body) (or) (health) of [*Identify child.*], and
>
> Third, that [*Identify child.*] was then less than seventeen years of age, and
>
> Fourth, that the defendant acted knowingly with respect to the facts and circumstances submitted in this instruction,
>
> . . . .
>
> then you will find the defendant guilty (under Count ___) of endangering the welfare of a child in the first degree.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Instruction 17, the verdict director for child endangerment of C.W., directed the jurors to find, among other facts not at issue in this appeal, the following:

> First, that on or about the month of May 2010, in the County of Bates, State of Missouri, the defendant knowingly engaged in *sexual contact* with [C.W.], and
>
> Second, that in so doing, the defendant created a substantial risk to the life or health of [C.W.]. . . .

(Emphasis added.)

Wadel argues that because Instruction 15 failed to describe, in the first paragraph of the instruction, the specific conduct that allegedly constituted "sexual contact," and stated only that Wadel "engaged in sexual contact with [A.W.]," the State was relieved of its burden to prove "sexual contact," a necessary element of first-degree child endangerment as charged in Count VI. Similarly, Wadel argues that because Instruction 17 failed to provide a concise statement of Wadel's conduct that allegedly "created a substantial risk to the life or health" of C.W., and stated only that Wadel "knowingly engaged in sexual contact with [C.W.]," the State was relieved of its burden to prove a substantial risk to C.W.'s life or health, a necessary element of first-degree child endangerment as charged in Count VII. The question here is whether the phrase "sexual contact," meets the requirement of MAI–CR 3d 322.10 that the defendant's conduct be described.

"Whenever there is an MAI–CR instruction or verdict form applicable under the law and Notes on Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." Rule 28.02(c).[11] It constitutes error for a court to give any instruction or verdict form that violates Rule 28.02 or the applicable Notes on Use. Rule 28.02(f). If a timely objection is made, the prejudicial effect is judicially determined. *Id.* Where no objection is made, however (as is the case here), we review for plain error, and reversal is warranted only if the defendant can show that manifest injustice or a miscarriage of justice resulted from the court's error. *See State v. Ludwig*, 18 S.W.3d 139, 142 (Mo. App. E.D.2000).

---

11. All rule references are to Missouri Supreme Court Rules (2011), unless otherwise noted.

In the present case, the verdict directors on child endangerment required either a description of the conduct or a concise statement of the conduct. A statement that the defendant engaged in "sexual contact" with the victim is not sufficiently specific to describe the conduct at issue. This is particularly evident with the instruction applicable to Count VI, the charge involving A.W. The first paragraph of Instruction 15 describes Wadel's conduct only as engaging in "sexual contact." Then, the second paragraph of the instruction states that the conduct set out in paragraph one, "constituted sexual contact." While we recognize that "sexual contact" is "conduct," it is clear that the first paragraph of the instruction requires a more precise description of the acts Wadel is accused of committing. Therefore, the mere identification of the conduct as "sexual contact" was not sufficient to "describe" the conduct.

The use of the phrase "sexual contact" to describe Wadel's conduct in the first paragraph of Instruction 17, applicable to Count VII involving C.W., does not present the exact same problem because the phrase "sexual contact" does not also appear in the second paragraph of Instruction 17. However, similar to MAI–CR 3d 322.10 (endangerment by sexual conduct), the first paragraph of MAI–CR 3d 322.10 (endangerment by substantial risk) requires a "concise description of defendant's conduct." As was the case with MAI–CR 3d 322.10 (endangerment by sexual conduct), we believe a description of the defendant's alleged acts, not just the inclusion of the legal term for those acts, is required. Therefore, because neither Instruction 15 nor 17 adequately described Wadel's alleged conduct, it was error to submit the verdict directors to the jury. We disagree with Wadel, however, that this error prejudiced him, much less re-

sulted in manifest injustice or a miscarriage of justice.

**The instructional error in this case did not result in prejudice or the higher burden of manifest injustice or a miscarriage of justice required for plain error relief.**

■■■ We read and consider all of the instructions together to determine whether a claimed error resulted in manifest injustice to the defendant and, thus, constituted plain error. *See Davies,* 330 S.W.3d at 787 (" 'In determining whether an instruction or omission of an instruction was prejudicial, all of the given instructions must be read and considered together.' ") (quoting *State v. Boyington,* 544 S.W.2d 300, 304 (Mo.App.1976)). In *Davies,* the defendant was charged with attempted enticement of a child. *Id.* at 781. This Court found that the verdict director's failure to require a finding by the jury that the defendant "committed an act that was a substantial step toward the commission of the offense" was cured by the jury explicitly finding that the defendant "committed the requisite substantial step" under two other counts of attempted statutory sodomy. *Id.* at 787. The verdict directors on the attempted statutory sodomy counts "required the jury to find that Davies contacted his intended victim, went to their agreed destination point and that 'such conduct was a substantial step toward the commission of the offense....' " *Id.* Reading all of the instructions together, and based upon the jury finding that defendant committed acts that constituted a "substantial step" in the two attempted statutory sodomy counts, the court held that "failure to explicitly require the jury to find a substantial step" in the verdict director for the attempted enticement count was not prejudicial. *Id.* at 787–89.

*Davies* is instructive in the present case. In this case, neither Instruction 15 nor 17

described the endangering conduct beyond alleging that Wadel knowingly engaged in "sexual contact" with the victims. However, in Instruction 6, the term, "sexual contact," was defined as "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person." In the same instruction, "deviate sexual intercourse" was defined as

> any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or, the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person.

"A person cannot engage in ... 'deviate sexual intercourse' with another person without one of those persons engaging in 'sexual contact' because the former act[ ] involve[s] ... the 'touching of another person with the genitals' and 'touching of the genitals or anus of another person, or the breast of a female person.'" *Miller,* 372 S.W.3d at 470 (quoting § 566.010(3)).[12]

Wadel was found guilty of two counts of statutory sodomy against A.W. and one count of statutory rape against C.W. Instruction 9 directed the jurors to find Wadel guilty of first-degree statutory sodomy if, among other facts, they found beyond a reasonable doubt that he "knowingly placed his finger in [A.W.'s] vagina, and ... that such conduct constituted deviate sexual intercourse. . . ." Instruction 11 directed the jurors to find Wadel guilty of first-degree statutory sodomy if, among other facts, they found beyond a reasonable doubt that he "knowingly had [A.W.] touch his penis, and ... that such conduct constituted deviate sexual intercourse. . . ." Instruction 13 directed the jurors to find Wadel guilty of first-degree statutory rape if, among other facts, they found beyond a reasonable doubt that he "knowingly had sexual intercourse with [C.W.]. . . ." Therefore, in finding Wadel guilty of two counts of statutory sodomy against A.W. and one count of statutory rape against C.W., the jury necessarily found that Wadel engaged in specific conduct that constituted "sexual contact." Further, engaging in sexual intercourse with a young child undoubtedly creates "a substantial risk to [the] life, body, or health" of the child. *See State v. Clay,* 909 S.W.2d 711, 714–15 (Mo.App. W.D.1995).

Although Instructions 15 and 17 were erroneous, their submission to the jury did not prejudice Wadel, much less result in a manifest injustice or a miscarriage of justice. Instructions 15 and 17 required the jury to find that Wadel knowingly engaged in sexual contact with the victims; the required allegation of specific conduct omitted from Instructions 15 and 17 was fully described in Instructions 9, 11, and 13; and Wadel was found guilty of those corresponding counts of statutory sodomy and statutory rape. Therefore, he did not suffer any prejudice, much less a manifest injustice, from the submission of Instructions 15 and 17.[13]

Points IV and V are denied.

---

12. *Miller* cites to RSMo Cum.Supp.2005. The relevant language of section 566.010, however, remains the same in RSMo Cum. Supp.2009, and thus the proposition still applies. 372 S.W.3d at 470.

13. Wadel does not argue that his convictions of a sexual offense and first-degree child endangerment, based on the same conduct, violate double jeopardy. Such an argument would not be well-founded, as this Court has found that charges of sodomy and rape each

## Conclusion

Wadel's reliance on the holding in *Pierce* is misplaced in the context of this case. The evidence, including the out-of-court statements of A.W. and C.W., was sufficient to support the convictions of statutory sodomy and statutory rape. It was error for the court to submit verdict directors in violation of the applicable MAI–CR; but this error did not rise to the level of manifest injustice or a miscarriage of justice required for plain error relief. Therefore, the judgment is affirmed.

ALOK AHUJA, Presiding Judge, and GARY D. WITT, Judge, concur.

require proof of a fact or element not required by first-degree child endangerment, and as a result, first-degree child endanger-

ment is not an "included offense" to which a limitation on multiple convictions or punishments would apply. *Clay,* 909 S.W.2d at 715.