**STATE of Missouri, Respondent,**

v.

**Richard Lee PIERCE, Appellant.**

**No. WD 49515.**

Missouri Court of Appeals,
Western District.

July 11, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 1995.

Application to Transfer Denied
Oct. 24, 1995.

Timothy R. Cisar, Lake Ozark, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Traci J. Sanders, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, P.J., and LOWENSTEIN and ELLIS, JJ.

LOWENSTEIN, Judge.

This appeal involves a felony charge of first degree sexual assault, in violation of Section 566.040, RSMo (1986)[1]. On September 8, 1993, Appellant (Pierce) was charged with the felony offense of statutory rape, as the state alleged that on August 24, 1992, he had sexual intercourse with KJB, to whom he was not married and who was then fourteen years old. Pierce was convicted and sentenced as a prior and persistent offender to a term of fourteen years imprisonment.

Because this appeal challenges the sufficiency of evidence to support a verdict beyond a reasonable doubt, this court, while not *weighing* the evidence, must scrutinize the entire record to assure that the evidence was indeed substantial. *State v. Harvey,* 641 S.W.2d 792, 799 (Mo.App.1982); citing *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47 (Mo. 1936). Ultimately, review is limited to whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged. *State v. Brooks,* 618 S.W.2d 22, 23 (Mo. banc 1981). Appellate review, where sufficiency is raised, is with a view to the evidence and all reasonable inferences favorable to the verdict. *State v. White,* 873 S.W.2d 874, 878 (Mo.App. 1994).

Because of the unusual circumstances here, all the relevant evidence will first be set out as follows:

Pierce lived with his girlfriend, Christina Redman, and **their** three year old son, Sam, in a trailer in Miller County. Also living with them was Pierce's daughter, Cindi. At this time, Pierce, though living with Redman,

---

1. This statute, amended effective January 1, 1995, now defines the charge as sexual intercourse without consent. As pertinent to the case at bar, in 1992, the statute's elements were: 1) sexual intercourse; 2) with a person, not married to the perpetrator; 3) where the victim was fourteen or fifteen years old. MAI–CR 3rd 320.04.2.

was still married to Cindi's mother, Nancy Pierce. KJB's family lived in the same trailer park, down the hill from Pierce.

Apparently, there were mutual feelings of affection between KJB, 14, and Pierce, 41. KJB told her mother of her desire to marry Pierce, and her mother instructed her to wait four more years, until she turned 18.

The first witness in the case was Christina Redman, Pierce's live-in girlfriend. A synopsis of her testimony is as follows:

Redman told authorities she left the trailer two times, Friday August 21st and Monday, August 24th, from 7:00 and 8:30 a.m., per an agreement, apparently so Pierce and KJB could spend time together alone. At trial, Redman admitted leaving the trailer at those times, but testified that the purpose of the agreement was so she could spend time alone with her son, Sam. She testified that she picked that time in the morning because it was a convenient time for both her and Pierce.

Redman decided to leave Pierce, but was worried about what would happen to Sam, so she made a hotline call to the Department of Family Services (DFS). Apparently, the call included information regarding a concern about a relationship between Pierce and the fourteen-year-old KJB.

That call prompted DFS worker Susie Harms (Harms), to contact Redman on August 25, 1992. At trial, Redman testified that she asked Harms what to do so that Pierce could not get Sam. Redman also testified at trial that her main purpose for calling Harms was to talk to her about the situation with Sam. She testified that she told Harms that she was concerned about the situation with KJB, but said she never told Harms that Pierce and KJB were having sexual intercourse. Instead, in response to Harms' question, Redman told her she did not know if they were having sexual intercourse or not. Redman testified that KJB never told her that she (KJB) and Pierce had ever had sex, nor did Pierce ever tell her that he and KJB had had sex.

Prior to trial, Redman made a statement at the Miller County Sheriff's Department, which stated her intention to leave Pierce.

At trial, Redman testified that this was because they "were not getting along," and that Pierce had a "bad attitude." She also testified that Pierce's "relationship" with KJB did not enter into her decision at all.

Also in her prior statement, Redman stated that she was not sure Pierce was telling her the truth about the agreement they had regarding her leaving the trailer in the morning hours. However, at trial, Redman recanted this, saying that during the time she made the statement, she was on medication for her seizures and had overdosed on it. Therefore, anything she said or wrote during that time was incorrect.

Additionally, she admitted at trial that Pierce had told her he loved KJB, but that he told her (Redman) he was going to talk to her (KJB) and tell her it was "not right."

At trial, Redman repeatedly denied leaving Pierce because of any relationship he had with KJB. Furthermore, she testified that she had never been informed by anyone that Pierce or KJB engaged in sexual intercourse.

Also prior to trial, Redman made a statement to Harms. In that statement she claims Pierce told her he was in love with KJB and that the agreement to leave the trailer was made so that Pierce could be with KJB. However, again at trial, Redman recanted the validity of the statement, saying it was incorrect because she was on medication. At trial, she again testified the purpose of the agreement was to allow her to spend time alone with Sam. Redman also testified that she told KJB's mother, J.B., about the agreement. To her knowledge, Redman testified, Pierce never had an opportunity to be alone with KJB in August of 1992. She testified that she knew this to be true because she followed him out of the trailer on one, maybe two occasions.

Additionally, at trial, Redman testified that at the time of the hotline call, she had a sexually transmitted disease, Trichomonas. Pierce also had the same disease.

The state's next witness, Harms, testified as follows:

Harms received a report of possible child abuse through the hotline on August 25th.

Harms said she was called by Redman on August 26th, questioning the welfare of her son, Sam. Harms testified that Redman told her that she wanted to get Sam out of the house because of the events occurring between Pierce and KJB.

Harms said because of this call she went to KJB's house to talk to KJB. Harms said that she did not tell KJB who she was or why she and the sheriff's deputy, Hubbs, were there. Harms testified that they interviewed KJB, who was quite hostile, for 30 to 45 minutes. Harms testified that KJB then told her about the sexual intercourse between she and Pierce, prompting Harms to take KJB to the sheriff's office to make a videotaped statement. However, Harms admitted at trial that KJB was never under oath either at her home or at the sheriff's office when making her statement. Furthermore, on cross-examination, Harms admitted that before the videotaped statement was attempted, the audio refused to work, so there was no sound recorded on the videotape.

Harms testified that she arranged for KJB to have a S.A.F.E. exam on August 26th, at St. Mary's hospital in Columbia. This was within seventy-two hours of the last alleged sexual intercourse between Pierce and KJB. Seventy-two hours is significant because evidence of sperm could still be discovered. (Harms said KJB told her that the last sex happened on August 24th). The charge against Pierce was for having intercourse with KJB on several dates, including the 24th. Harms testified that the exam had, indeed, taken place. However, the state did not present evidence of the results of the S.A.F.E. exam, nor did they produce the doctor conducting the examination to testify about the exam.

On cross-examination, Harms admitted that she had not researched into KJB's whereabouts on the alleged dates of intercourse. She admitted that she could not say if KJB was even given an opportunity or was available to have sex with Pierce on the alleged dates.

Deputy Hubbs was also called as a witness, but gave the same testimony as did Harms about the interview with KJB.

The state's next witness was KJB. On direct examination, KJB testified that Harms and Hubbs came to visit her because of a report made by Redman, claiming that KJB and Pierce had "slept together." KJB further testified that Harms and Hubbs told her that if she told them what they wanted to hear, they would let her go and would do nothing to her. KJB said it was then that she admitted the sex because, "it was what they wanted to hear," and because she wanted to go home and be left alone.

KJB said every time she admitted having sex with Pierce to Harms and Hubbs, were lies. Likewise, she said it was not true when she was making the videotape … she only said it because she wanted to go home. KJB said she had never discussed marriage with Pierce or her mother, and that her mother had never told her she had to wait until she was 18 to get married.

When asked about several letters she had written to Pierce, who was then in jail, she said she did not remember writing them and said she could not be certain that the writing on the letter was hers. Nevertheless, the prosecutor asked her questions about the content of one letter to Pierce. The letter said, "When you get out will you still marry me?" KJB said she did not remember writing that in the letter.

The only letter actually admitted into evidence was one from KJB to her friend, Pierce's teenage daughter, Cindi. The letter read, "I will try to get Richard out of jail, I will even lie about what happened." When asked about what the "I will lie" referred to, she said she was not lying on the stand and reiterated that Pierce never had intercourse with her.

During cross-examination, KJB testified that when she first told Harms and Hubbs that she and Pierce had not had sex, they refused to believe her. She said no one from DFS or the sheriff's office had contacted her to see where she was on the dates that the sex allegedly occurred. On those dates, KJB and her mother, J.B., both testified that KJB was at a friends house spending the night.

KJB also admitted that she had recanted her accusations of sex at multiple times

throughout the pre-trial process. She said she recanted at the first preliminary hearing, at her deposition, at the second preliminary hearing, and was recanting "here today" (at trial). After being warned about perjury, KJB said she was not lying on the stand and that she understood what sexual intercourse was and that she and Pierce had not had it.

On cross-examination, KJB was then asked about the results of her S.A.F.E. exam. KJB testified that the doctor told her that there was no sperm found inside her. KJB also said that she was told she did not have Trichomonas, and testified that she had never, at any time, had a sexually transmitted disease.

On redirect, the prosecutor then asked her if she was more interested in helping the defense than the prosecution. KJB said "no."

Next, the state called KJB's mother, J.B. In sum, she testified that she could not remember anything that she had done or said in August of 1992. She could not remember if KJB and Pierce told her they wanted to marry, and she could not remember Redman's telling her about the alleged agreement to leave KJB and Pierce alone together. J.B. did testify that on the dates of the alleged intercourse, KJB was at a girlfriend's house staying overnight.

Finally, the state called Pierce's daughter, Cindi Pierce. Pierce, like J.B., also could not recall whether or not she knew any information about the alleged relationship between Pierce and KJB. Cindi Pierce then testified that KJB would have told her if there had been a sexual relationship between KJB and Pierce. Cindi Pierce said she had never seen her father and KJB engage in intercourse, and that KJB told her that her accusations made to Harms were not true.

At the close of this evidence, Pierce's motion for directed verdict was denied, and was again denied upon renewal of the motion at the end of all evidence.

## I.

Pierce claims the trial court erred when it denied his motion for acquittal both at the close of the state's evidence, and again at the close of all the evidence, because there was insufficient evidence to submit this case to the jury because the weight and reliability could not allow a reasonable juror to find him guilty "beyond a reasonable doubt."

■ More specifically, the above claim is grounded in the following: Where the only substantive evidence against the defendant in a statutory rape case is an out-of-court statement made by the prosecutrix to authorities, but prior to and at trial, the prosecutrix repeatedly recants her statement that sex occurred, may the conviction be upheld without corroborating evidence?

Because this factual situation (where a witness actually recants the accusation under oath) is unique to Missouri courts, so a brief history of the law governing rape prosecutions is necessary.

[a] Undisputed here is the fact that this conviction was based on the prosecutrix's out-of-court statement to a DFS worker, following a hotline call, to the effect that sex had indeed taken place between herself and Pierce. Until 1985, Missouri courts held that a witness' prior, out-of-court, inconsistent statements could be admitted in evidence only to impeach and not as substantive evidence. *State v. Granberry*, 491 S.W.2d 528, 530–31 (Mo. banc 1973).

In 1985, the legislature modified the above rule in some criminal cases (including rape), by enacting § 491.074 RSMo (1986). § 491.074 provides:

Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as **substantive evidence** and the party offering the prior inconsistent statement may argue the truth of such statement. (emphasis added)

In *State v. Bowman*, 741 S.W.2d 10 (Mo. banc 1987), the Supreme Court of Missouri held that the use of § 491.074 does not violate the Right of Confrontation, in essence, declaring the statute and the use thereof, constitutional.

In a nutshell, *Bowman* held an inconsistent out-of-court statement under § 491.074, if admitted, is enough to support a conviction. In the instant case, this statute governs the admissibility of KJB's prior, unsworn, uncorroborated, inconsistent statements to Harms, in which she admitted having sex with Pierce. KJB's trial testimony was that there was no sexual intercourse between her and Pierce. However, what has not been answered is whether § 491.074 allows a conviction beyond a reasonable doubt to be supported based on only **one single** inconsistent statement, uncorroborated and unsworn, as the only evidence of guilt.

Although § 491.074 settles the question of inconsistent statement **admissibility,** this court must now look at the law governing rape prosecutions concerning the necessity of corroboration where the admissible out-of-court statement is recanted by the prosecutrix's testimony.

■ **[b]** Ordinarily, the uncorroborated testimony of the victim of a rape, sodomy, or sexual assault is sufficient to support a conviction for those offenses. See e.g., *State v. Harris,* 620 S.W.2d 349, 353–54 (Mo. banc 1981); *State v. Baldwin,* 571 S.W.2d 236, 239 (Mo.1978); *State v. Henson,* 754 S.W.2d 573, 575 (Mo.App.1988). However, corroboration of the prosecutrix's testimony may be necessary under certain circumstances.

The two latest pronouncements on when corroboration of the victim's evidence is necessitated, come in *State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995), and *State v. Frey,* 897 S.W.2d 25, 29 (Mo.App.1995).

*Silvey* involved sodomy charges committed on a four year old child who was six at trial. 894 S.W.2d at 664. The defendant insisted inconsistent and contradictory testimony by the child required the state to corroborate. *Id.* 672–73. The child on direct exam had testified in graphic detail to acts of oral sex, while during cross-examination had been asked about statements to a DFS worker about rubbing incidents, and things Silvey had done to her in her dreams. The Court said at page 673:

> "Corroboration is not mandated unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful. *State v. Harris,* 620 S.W.2d 349, 353 (Mo. banc 1981). Although A.P.'s answers on direct examination differed from those on cross examination, her testimony did not conflict with physical facts, surrounding circumstances and common experience."

The conviction was affirmed. *Id.* at 673.

This court, in *Frey,* which involved the rape of a nursing home resident, although reversing the conviction on admission of prejudicial evidence, failed to honor the defendant's request to invoke the corroboration rule set out in *State v. Kuzma,* 751 S.W.2d 54, 58 (Mo.App.1987), saying that: "[I]f the inconsistencies in the victim's testimony leave her testimony unconvincing and clouded with doubt, corroboration is required." 897 S.W.2d at 28.

> "The corroboration rule does not apply when the inconsistencies or contradictions in the victim's trial testimony involved proof not essential to the case. *State v. Gardner,* 849 S.W.2d 602, 604 (Mo.App. 1993). The inconsistencies regarding the precise time, the clothing she was wearing, and other minor details, do not involve contradictions or inconsistencies that 'go directly to an essential element of the state's case'."

*Id.* at 28.

Applying the evidence of the victim in the case at bar (remembering the August out-of-court statements are deemed substantive evidence), as shown below[2], to the test laid

---

**2.** *Timeline*

| | | |
|---|---|---|
| (August, 1992) | DFS worker at KJB's home: | KJB denies sexual intercourse. |
| (August, 1992) | DFS worker at KJB's home: | KJB admits sexual intercourse |
| (August, 1992) | Police station, videotape: | KJB admits sexual intercourse |
| (October, 1992) | Preliminary hearing #1: | KJB denies sexual intercourse |

down in *Silvey*, the court rules corroboration here was necessary. KJB's trial testimony was 180 degrees opposite of and contradictory to her out-of-court statements on the absolutely essential element here, intercourse. There was no physical fact evidence in the case. Additionally, the surrounding circumstances and common experience do not support the allegation of sexual intercourse. Without evidence of results of KJB's medical exam, or any other evidence to corroborate her inherently conflicting testimony on the essential element, her out of court statements were not adequately corroborated. Much of that other testimony went to opportunity for intercourse, which is not sufficient to establish the crime occurred.

Simply put, this case boils down to a criminal trial for sexual intercourse with an underage prosecutrix. Her statements to authorities, admissible by statute, make a prima facie case against Pierce, but her subsequent statements and in-court sworn testimony, unequivocally contradict her earlier statements and deny the essential element of the crime. Sufficient corroboration of the out-of-court statements was, in this case, required ... but the corroborative evidence was not sufficient to support the verdict. The jury here should not have been merely free to decide which time KJB was telling the truth, without the benefit of corroborating evidence. The court is not so naive as to overlook the strange fact that the prosecutrix, the hotline caller, and all the witnesses (other than the authorities), totally recanted at trial ... almost as if some sort of persuasion has occurred. However, it is beyond the authority of this court to reach past the record presented here to make that conclusion.

## II.

■ The lack of sufficient corroboration to support the conviction requires reversal of the case at bar. However, it must be mentioned that this court believes it should also answer in the negative the question of wheth-

er a conviction can be supported only by a prior inconsistent statement as the only evidence of prosecution. The distinction lies in the difference between **admissibility** of the prior statement, and the **sufficiency** of the evidence derived from the one piece of evidence. To hold otherwise would be to allow an overly broad reading and meaning of the statute. See § 491.074.

The United States Supreme Court's language in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), looms like a cloud over the idea that, somehow, a conviction based solely on a out-of-court inconsistent statement, satisfies due process. Due process limits the jury's ability to convict. *Id.* at 319, 99 S.Ct. at 2789. The Court has long acknowledged that due process prohibits a criminal conviction except on proof beyond a reasonable doubt. *Id.* at 316, 99 S.Ct. at 2789. This rule requires more than a ritualistic trial. *Id.*

It is clear to this court today, that because there is an absence of adequate safeguards to assure reliability, a conviction based solely on a prior statement, though admissible via statute, falls short of due process protection.

One reason for this is the lack of trustworthiness in the atmosphere where the prior out-of-court statement was procured. A less than impartial questioner could, hypothetically, maneuver the witness into giving an inaccurate statement. See 4 J. Weinstein and M. Burger, Weinstein on Evidence, § 801(d)(1)(A)[01], at 801–807 (1985).

Additionally, the jury may draw unreliable inferences from its mistrust of the declarant's present demeanor. The demeanor may have been equally poor at the time she made the prior statement, but that demeanor is hidden from the critical eyes of the present trier of facts. S. Goldman, *Guilt By Intuition: The Insufficiency of Prior Inconsistent Statements To Convict*, 65 N.C.L.Rev. 1, 11 (1986–87). A witness' unsatisfactory trial demeanor should not provide a sufficient ba-

| (November, 1992) | KJB's deposition: | KJB denies sexual intercourse | (January, 1994) | In–Court testimony: | KJB denies sexual intercourse |
| (March, 1993) | Preliminary hearing #2: | KJB denies sexual intercourse | | | |

sis to permit conviction solely on that witness' prior unobserved statement. See *People v. Casillas,* 60 Cal.App.2d 785, 141 P.2d 768, 772 (Cal.App.1943).

Another danger is that people tend to believe the prior statements rather than the in-court repudiation. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

However, the danger of unreliability is inherent in the substantive evidentiary use of any out-of-court assertion and never more so than with the use of a prior inconsistent statement, the truth of which the declarant denies at trial. When the trier of fact decides to believe a witness' prior statement rather than the in-court contradiction, that decision often is based solely on guess or intuition, not credible facts. This inherent danger is compounded when that prior inconsistent statement is the only prosecution evidence against the accused, and becomes the sole basis for conviction. *Jackson,* 443 U.S. 307, 323, 99 S.Ct. 2781, 2791 (1979). Convictions should be founded on competent evidence, they should not be founded solely on unsupported intuition. See W. Blakey, *Substantive Use of Prior Inconsistent Statements Under the Federal Rules of Evidence,* 64 Ky.L.J. 3, 22 (1975).

Several states with statutes almost identical to Missouri's § 491.074, have already faced the question at hand and have refused to allow criminal convictions based only on the inconsistent statement. The Supreme Court of Utah, in *State v. Ramsey,* a case where two children made prior statements alleging sexual abuse but then recanted at trial, held that a person could not be convicted of a crime solely on the basis of an unsworn, uncross-examined, out-of-court statement, subsequently denied at trial. 782 P.2d 480, 483 (Utah 1989).

In so holding, the *Ramsey* court cited the Sixth Circuit's language in *United States v. Orrico,* which held:

Rule 801(d)(1)(A) will theoretically enable a party to make out a prima facie case even if his only evidence *is* a previous inconsistent statement of this type. Under the rule, "if the only evidence of some

essential fact is such a previous statement, the party's case falls."

It is doubtful, however, than in any but the most unusual case, a prior inconsistent statement alone will suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone. 599 F.2d 113, 118 (6th Cir.1979).

The *Orrico* court concluded that, generally evidence of an uncorroborated prior inconsistent statement is not sufficient to establish evidence of a central element of the crime charged. *Id.* at 118–119.

Furthermore, several other states agree with the Sixth Circuit and Utah holdings. Alaska, Florida, Delaware, Montana, and Louisiana all have similar cases holding an unsworn, uncorroborated statement alone insufficient to convict when later repudiated at trial. See e.g., *Brower v. State,* 728 P.2d 645 (Alaska App.1986); *Thompson v. State,* 769 P.2d 997 (Alaska App.1989); *Acosta v. State,* 417 A.2d 373 (Del.1980); *State v. Moore,* 485 So.2d 1279, 1281 (Fla.1986); *State v. Allien,* 366 So.2d 1308, 1311 (La.1978); *State v. White Water,* 194 Mont. 85, 634 P.2d 636, 639 (1981).

The case which is essentially identical to the one at bar is *Brower v. State,* where Brower was charged with sexual misconduct of a 16 year old, J.L., 728 P.2d at 646. J.L. told the grand jury of several instances of improper advances, rubbing and touching by Brower. *Id.* However, at trial, J.L. totally recanted this story. *Id.* Nonetheless, the jury convicted. *Id.*

Alaska, like Missouri, has a statute modeled after FRE 801(d)(1)(A), which allows the prior inconsistent statement in as substantive evidence. The court reversed the conviction, holding *Orrico* was persuasive, and that J.L.'s grand jury testimony did not compromise sufficient evidence to sustain the conviction. *Id.* at 647. The court pointed out that the most important factors were that J.L. retracted and that no corroboration existed to otherwise prove the essential element of the crime. *Id.*

The *White Water* case presented the Supreme Court of Montana with the issue of

whether "in a criminal case an alleged prior inconsistent statement should be submitted to the jury for consideration as substantive evidence of an essential element of the charged crime where the accuracy of that statement is repudiated at trial," 634 P.2d at 637. In that case, as here, the victim told authorities of improper activity by her father, but recanted on the stand, and there were no other credible witnesses to establish the essential element of the crime, thus the conviction was reversed. *Id.* at 637–38.

This court agrees with the logic as set forth in the preceding cases. It is this court's view that a case such as this should be very difficult to prosecute after the prosecutrix has, on the stand, recanted her accusations.

Accordingly, the judgment is reversed, and the defendant is ordered discharged.

All concur.