

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

STATE OF MISSOURI,                   )
)
              **Respondent,**   )
)   **WD86179**
v.                           )
)   **OPINION FILED:**
)   **October 1, 2024**
)
FRANK G. WASHBURN, Sr.,    )
)
              **Appellant.**   )

**Appeal from the Circuit Court of Boone County, Missouri
The Honorable Joshua C. Devine, Judge**

**Before Division One:** Edward R. Ardini, Jr., Presiding Judge,
Mark D. Pfeiffer and Cynthia L. Martin, Judges

Mr. Frank Washburn ("Washburn") appeals from a Circuit Court of Boone County, Missouri ("trial court"), judgment after jury trial convicting him of one count of enticement of a child (Count I), one count of first-degree statutory sodomy (Count III), and one count of first-degree child molestation (Count IV). On appeal, he challenges the sufficiency of the evidence to support his convictions on Counts III and IV and the trial court's decision to exclude evidence offered by Washburn at trial. We affirm.

## Factual and Procedural History[1]

Washburn was born in 1952 and has three biological children, including M.R. ("Mother"), T.G. ("Aunt"), and son W.W. ("Uncle").[2][3]  Washburn also has an adopted daughter, K.W. ("Daughter").  Mother is married to J.R. ("Father"), and they gave birth to T.R. ("Victim") in April of 2003.  Aunt is married to M.G. ("Aunt's Husband") and has two children including L.P. ("Cousin").

Prior to 2015, Washburn was living in a mobile home in New Franklin, Missouri, with Aunt, Aunt's Husband, their children, and Uncle.  The mobile home had three bedrooms.  Washburn slept alone in one of the bedrooms on a twin bed.

Though Victim lived elsewhere, she would visit Aunt's mobile home a few weekends each month to "hang out."  Victim spent a lot of time with Washburn during her visits.  Washburn took Victim to parks and on shopping trips, where he would buy her gifts.  At the time, Victim felt she and Washburn had a very close relationship.

Mother testified that on May 25 or 26, 2016, Victim, then thirteen, told Mother that Washburn had been saying "inappropriate things" to her and asked Mother to make him stop.  Mother asked Victim to elaborate, and Victim said that, while she was on a recent shopping trip with Washburn to Walmart, Washburn offered Victim money to let

---

[1] On appeal from a jury-tried case, the appellate court views the facts in the light most favorable to the jury's verdict.  *State v. Carter*, 523 S.W.3d 590, 593 n.1 (Mo. App. W.D. 2017).

[2] All statutory references are to THE REVISED STATUTES OF MISSOURI 2016, as supplemented through May 26, 2016, unless otherwise indicated.

[3] Pursuant to the directive of section 509.520 (RSMo Supp. III 2023), we do not provide the names of any non-party witnesses in this opinion.

him "lick her pussy while she was sleeping." Later that evening, Victim told Father what had happened, and Mother and Father went to the police department to make a report of the disclosures.

On June 6, 2016, Victim gave a recorded forensic interview that was admitted at trial pursuant to section 492.304 and was played for the jury. Victim told the interviewer that when she was ten, Washburn asked Victim to come to his room when Victim was visiting the mobile home. Victim often watched television in Washburn's bedroom and did not think anything of his request. Victim told the interviewer that upon entering Washburn's bedroom, Washburn wanted Victim to show him her "boobs." Victim said "no," but Washburn pushed her down on the bed and then forced her bra and t-shirt down. Victim said Washburn grabbed her exposed "boob on the skin."

Victim stated that Washburn then told her to show him her "butt." Victim again said "no," so Washburn flipped her over and forced her pants and underwear down. While Washburn was forcing her clothes down, Washburn told Victim that people in the world are not good and most older guys are going to try to do this to her. Washburn said he was trying to teach her a lesson about how people were going to treat her. At that moment, Mother happened to call Victim's phone, providing Victim with an excuse to leave the bedroom.

Victim told the interviewer that a day or two before Washburn forced her to show her "boobs" and "butt," Washburn had talked to her about "guys licking girls" while riding on a golf cart. Washburn told her the world is not a safe place and said guys are going to try to do that to her. He told her he enjoyed doing it when he was younger.

3

Victim stated that after dropping off the golf cart, Washburn pointed out girls he would enjoy "licking" on their walk back to the mobile home. Victim said these comments made her uncomfortable, so she tried to ignore Washburn by playing games on her phone.

Victim said she did not talk to anyone about Washburn's conduct at the time but chose to disclose it now because of the more recent incident at Walmart. She told the interviewer that, about a week before the interview, Washburn took her to Walmart, where he bought her a Sims 4 game, a speaker, headphones, and two sets of dumbbells. Upon returning to Washburn's truck, Washburn told her he had $200 left that she could use to buy anything she wanted if she would allow him to "lick her pussy while she was asleep." Victim said "no," and Washburn tried to convince her it was okay because she would be asleep and would not even know it happened. Victim said she turned on her headphones and ignored Washburn for the remainder of the drive home.

Victim also told the interviewer that Washburn was always making inappropriate remarks about her "boobs" and that he talked to her about secrets, saying she was old enough to keep them.

Following the first forensic interview, Victim recalled another incident where Washburn touched her "down there." A second forensic interview took place on June 23, 2016, wherein Victim told the interviewer that she used to sleep in Washburn's bed when she visited the mobile home because she did not like sleeping in the living room. Victim stated that the night after the golf cart conversation, she woke in the middle of the night

4

to find Washburn's hand down her underwear. She stated she was facing the wall and Washburn was facing her back with his arm draped over her and down her underwear.

Victim said Washburn put his hand in her underwear, scooted it down a little, and was all the way in her underwear up to his wrist. She said his hand was just sitting there cupping her vagina. Victim said she could not tell if Washburn was awake or asleep. Victim said she was too scared to do anything, so she just ignored Washburn's hand. Victim stated at some point, Washburn removed his hand and she started to fall asleep, but she vaguely recalled Washburn putting his hand back on her vagina before she truly fell asleep.

Victim was nineteen when she testified at trial. Despite the passage of six years since the forensic interviews, her testimony at trial was largely consistent with her earlier disclosures.

Victim testified that when she was ten years old, Washburn asked her to come into his room, and she followed him inside. Victim testified that when she got onto Washburn's bed he told her to show him her "boobs." Victim said "no," but Washburn forcibly grabbed the top of her shirt and bra and pulled them down exposing her breasts. Victim testified that Washburn then asked him to show him her "butt," that Victim again said "no," and Washburn proceeded to forcibly pull down her pants and underwear, exposing her "butt."

Victim initially could not recall if Washburn "grabbed" her "boobs" but later testified that she, in fact, did believe he grabbed or touched an exposed breast. Victim said she did not move to push him away because she was "frozen" and "scared," and she

did not want to get in "even more trouble." Victim testified that she left the room when Mother called her phone. Victim stated she did not tell anyone about the incident because she "was in shock" and "confused."

Victim also testified about the night in Washburn's bed. Victim testified that she was facing the wall, and she woke to find Washburn "spooning" her with his hand down her underwear "kind of between the folds" of her vagina. Victim testified that she did not know if Washburn was awake or asleep during the incident.

Finally, Victim testified about the Walmart incident. Victim testified that Washburn would take her shopping "very frequently" and that Washburn would generally buy items she wanted without a spending limit. Victim testified that when Washburn took her to Walmart in May of 2016, she selected speakers but could not remember any other items purchased. Victim testified that, as they were leaving in Washburn's truck, Washburn told Victim that he had $200 left over from their shopping trip and "he would give it to [Victim] if [she] allowed him to lick [her] pussy after [she] fell asleep." Victim testified that she was uncomfortable, that she told Washburn "no," and that she did not want to speak with him further after that.

Victim testified that she did not tell anyone about Washburn's comment that day because she was "still processing" it and was "comparing it to other things that had happened before" and "wondering if this was any different; it this was a normal thing or if this was something bad." Victim testified that she eventually decided to disclose the abuse to her parents because the Walmart incident "affirmed everything in [her] mind

6

that he wasn't asleep when he did what he did to [her] the first time when [she] woke up with his hand in [her] pants, and it was intentional."

Washburn testified in his own defense at trial. He testified that Victim never slept with him in his bed and denied ever touching Victim inappropriately. Washburn called multiple witnesses as part of his defense, including Cousin. However, before Cousin could testify, a bench conference was held in which defense counsel laid out a proposed line of questioning that concerned previous testimony by Mother.

Earlier in the trial, Mother testified that she spoke to Cousin on the night of Victim's disclosure or a "couple of days thereafter" because she wanted to know if something had happened between Washburn and Cousin. Mother was asked on cross-examination if Mother tried to "talk [Cousin] into the proposition that [Washburn] had done something improper to [Cousin]." Mother answered "[n]o."

At both the bench conference, and prior to Cousin's testimony, defense counsel stated he wanted to elicit evidence that Mother had previously claimed Cousin had been sexually assaulted by Washburn and then have Cousin testify that she had not been sexually assaulted by Washburn. In response to the prosecutor's relevancy objection, defense counsel argued that Cousin's testimony was relevant for impeaching Mother's credibility. The trial court permitted defense counsel to present Cousin's testimony in the form of an offer of proof, but ultimately sustained the State's objection and explained that calling a witness to comment on the credibility of another witness who was *not* the victim and presenting testimony related to a line of inquiry regarding events that the defendant was *not* on trial for constituted an inadmissible "side show" and "mini trial" on collateral

7

matters. In its ruling, the trial court reminded defense counsel that it had excluded similar evidence that the State sought to submit in response to defense counsel's relevancy objection.[4]

After a four-day trial, the jury found Washburn guilty as charged on Counts I, III, and IV of the State's Superseding Indictment and not guilty as to Count II.[5] Washburn timely filed a motion for judgment of acquittal notwithstanding the verdict or for a new trial. In that motion he argued, *inter alia*, that there was insufficient evidence that the touching in bed charged under Count III was done for purpose of arousing or gratifying Washburn's sexual desire because Victim testified that Washburn may have been asleep during the incident. Washburn further argued that there was insufficient evidence of sexual contact under Count IV because Victim testified she could not remember if Washburn touched her breast. Finally, Washburn argued the trial court erred in excluding Cousin's testimony designed to attack Mother's credibility as a witness.

The trial court denied Washburn's motion for a new trial and sentenced Washburn to five years on Count I, ten years on Count III, and five years on Count IV. The trial

---

[4] Before trial, the State filed a notice of its intent to introduce propensity evidence the State believed was admissible pursuant to Article 1, Section 18(c) of the Missouri Constitution. The State called Mother and Daughter to testify at a subsequent hearing on the matter, and both testified that they were sexually assaulted by Washburn as minors. Upon objection by defense counsel, the trial court sustained the objection, refusing to permit the State to present evidence of the uncharged alleged crimes at trial.

[5] Count I of the Superseding Indictment charged Washburn with enticement of a child for offering to pay Victim $200 to lick her vagina; Count II charged Washburn with statutory sodomy in the first degree for touching Victim's genitals with his hand while Victim was in a golf cart; Count III charged Washburn with statutory sodomy in the first degree for touching Victim's genitals while she was lying in bed, and Count IV charged Washburn with child molestation in the first degree for touching Victim's breast.

court ruled that Count III would run concurrently with Count I but consecutively to Count IV.

Washburn now appeals, raising two sufficiency-of-the-evidence points on appeal with respect to Counts III and IV and a third point on appeal that the trial court abused its discretion by excluding Cousin's testimony.[6]

### Standard of Review for Points I and II

> When reviewing the sufficiency of the evidence to support a conviction and a trial court's denial of a motion for judgment of acquittal, we do not re-weigh the evidence.  Instead, we accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignore all contrary evidence and inferences.

*State v. Gehring*, 599 S.W.3d 526, 529 (Mo. App. W.D. 2020) (internal citations and quotation marks omitted) (quoting *State v. Martin*, 575 S.W.3d 764, 767 (Mo. App. W.D. 2019)).  "The assessment is not whether this Court believes that the evidence established

---

[6] Before analyzing Washburn's points on appeal, we first note that Washburn's statement of facts fails to comply with Rule 84.04(c), MISSOURI COURT RULES, VOLUME I—STATE (2023), which requires "a fair and concise statement of the facts relevant to the questions presented for determination without argument."  "The primary purpose of the statement of facts is to afford an immediate, accurate, complete and unbiased understanding of the facts of the case." *Tavacoli v. Div. of Emp't Sec.,* 261 S.W.3d 708, 710 (Mo. App. W.D. 2008) (internal quotation marks and citations omitted).

Washburn's statement of facts is argumentative and does not contain a fair and concise statement of the facts relevant to the questions presented.  It instead impermissibly contains Washburn's version of the factual events rather than a statement of the evidence in the light most favorable to the verdict. *Waller v. A.C. Cleaners Mgmt., Inc.*, 371 S.W.3d 6, 10 (Mo. App. E.D. 2012).  These appellate briefing errors justify dismissing Washburn's appeal. *Lattimer v. Clark*, 412 S.W.3d 420, 422-23 (Mo. App. W.D. 2013).  However, we will exercise our discretion to review, *ex gratia*, the substantive merits of his appeal. *Burgan v. Newman*, 618 S.W.3d 712, 714 (Mo. App. E.D. 2021); *see also Lattimer*, 412 S.W.3d at 423. ("Occasionally, non-compliant briefs of appellants are reviewed *ex gratia*.").

guilt beyond a reasonable doubt but, rather, whether, in light of the evidence most favorable to the verdict, any rational fact-finder could have found guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (quoting *Martin*, 575 S.W.3d at 767).

## I.

"A person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." § 566.067.1 (Supp. 2013). At the time of the alleged assault, the definition of "sexual contact" included "any touching of . . . the breast of a female person . . . for the purpose of arousing or gratifying the sexual desire of any person." § 566.010(3) (Supp. 2013). The State was therefore required to prove that Washburn touched Victim's breast when she was under the age of fourteen for the purpose of arousing or gratifying his sexual desire.

Washburn argues in his first point on appeal that his conviction on Count IV must be overturned because there was insufficient evidence that he touched Victim's breast. Specifically, he argues that (1) Victim "effectively recanted" her statements of sexual contact made during the first forensic interview when she testified at trial that she could not remember if Washburn grabbed her breast and; (2) that Victim's first forensic interview, admitted under section 492.304, was not alone sufficient to support a conviction because it was not also admitted under section 491.075. We disagree.

Ample evidence supports the jury's verdict on Count IV. Victim stated in her first forensic interview that when she was ten, Washburn invited her into his private bedroom,

10

told her to sit on his bed, and then told Victim to show him her "boobs." Victim stated

she told Washburn "no" but that Washburn proceeded to push her down on the bed, pull

down her shirt and bra, and grab her "boob on the skin." Victim stated that Washburn

then forcibly pulled down her pants and underwear. Victim stated she was only able to

extricate herself from Washburn's bedroom when Mother called.

Victim consistently testified to these same events *at trial*, including that she

believed Washburn *touched or grabbed her breast on her bare skin*. Thus, Victim did

not "recant," [7] her allegations of molestation as Washburn suggests, but instead

reaffirmed the statements made at the first forensic interview that she *was* molested by

Washburn. Based on Victim's forensic interview and trial testimony, a reasonable juror

could conclude that Washburn touched Victim's breast when she was under the age of

fourteen.

Likewise, a reasonable juror could infer that Washburn touched Victim to gratify

his own sexual desire based on the nature of the act itself. *See State v. Nieto*, 689 S.W.3d

at 246 (holding that touching a woman's breast can be evidence of intent to gratify sexual

desire).[8]

Furthermore, Washburn's contention that Victim's first forensic interview could

not alone support his conviction because it was admitted under section 492.304[9] and not

---

[7] Black's Law Dictionary defines "recant" as "[t]o withdraw or renounce (prior
statements or testimony) formally or publicly." *Recant*, BLACK'S LAW DICTIONARY
(10th ed. 2014).
[8] Washburn does not challenge this element of the crime on appeal.
[9] Section 492.304.1 provides in relevant part that "the visual and aural recording
of a verbal or nonverbal statement of a child when under the age of fourteen who is

section 491.075[10] is legally incorrect. Sections 492.304 and 491.075 provide

"alternative" not "exclusive" grounds for admitting the recorded statement of a minor

child. *State ex rel. Jackson v. Parker*, 496 S.W.3d 559, 563 (Mo. App. S.D. 2016) ("The

plain language used in both § 491.075 and § 492.304 indicates that each statute provides

an alternative, rather than an exclusive, procedure for determining the admissibility of the

recording . . .").

Once admitted under section 492.304, Victim's first forensic interview did not

require separate admission pursuant to section 491.075, and the jury could consider it for

"any purpose" *including as substantive evidence of Washburn's guilt. State v. McCoy*,

678 S.W.3d 125, 132 n.3 (Mo. App. E.D. 2023) (stating that "[s]ections 491.075 and

492.304 provide independent alternatives for determining admissibility of a recording of

a statement of a child under the age of 14, and application of each does not require

satisfaction of the other"); *State v. James*, 605 S.W.3d 132, 134 (Mo. App. S.D. 2020)

(holding that evidence admitted under section 492.304 is not limited in "any manner to

any particular purpose.").

Washburn attempts to save his argument by relying on *State v. Pierce*, 906 S.W.2d

729, 735 (Mo. App. W.D. 1995), for the proposition that "a conviction based solely on a

---

alleged to be a victim of an offense under the provisions of chapter 565, 566 or 568 is admissible into evidence[.]"

[10] Section 491.075.1 provides in relevant part that "[a] statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568 or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted . . ."

prior statement, though admissible via statute, falls short of due process protection."
Though unclear, it appears Washburn is arguing that even if the first forensic interview is admissible as substantive evidence under section 492.304, that admission is not alone sufficient to withstand a sufficiency-of-the-evidence challenge because Victim testified "differently" at trial. Washburn's argument demonstrates a fundamental misunderstanding of *Pierce* and subsequent case precedent discussing the holdings in *Pierce*.

In *Pierce*, the defendant was convicted of statutory rape based on a prior inconsistent statement made by a minor victim alleging the defendant had sex with her. *Pierce*, 906 S.W.2d at 731-33. The minor victim *recanted* her accusations of abuse multiple times throughout the pre-trial process and again at trial. *Id.* Our court determined that although the minor victim's prior inconsistent statement was properly admitted pursuant to section 491.074, a defendant's sexual assault conviction could not be based solely on a prior inconsistent statement that was *recanted* at trial in the absence of any corroborating evidence. *Id.* at 734–735.

By contrast, Victim did *not* recant her pre-trial testimony at trial. And more importantly, the "corroboration rule" established in *Pierce* was later abrogated by the Missouri Supreme Court in *State v. Porter*, 439 S.W.3d 208, 212-213 (Mo. banc 2014):

> The corroboration rule is abolished in Missouri. Missouri appellate courts reviewing the sufficiency of the evidence to support a conviction for a sex crime, as in all other criminal cases, will review challenges to the sufficiency of the evidence pursuant to generally applicable standard of review.

*Porter* stressed that a primary reason for abrogating the corroboration rule is that it conflicted with our appellate standard of review, which affords great deference to the trier

of fact because they are in a better position to judge credibility and other "intangibles" not easily gleaned from the record. *Id*. at 212. It is not the function of our appellate courts to act as a "super juror" and reweigh factual determinations supported by sufficient evidence. *Id.* Once a prior inconsistent statement is admitted as substantive evidence under our state statutes it can support a conviction. *See State v. Betts*, 559 S.W.3d 47, 54 (Mo. App. E.D. 2018) (holding that recanted prior inconsistent statements could be used to prove the defendant's identity as a perpetrator in a robbery under section 491.074).

*Betts*, provides an example*:*

> Because prior inconsistent statements are admissible as substantive evidence in criminal cases under Section 491.074, an appellate court cannot determine such a statement is insufficient evidence to support a conviction without engag[ing] in credibility determinations that are properly left to judges and juries sitting as triers of fact.

559 S.W.3d at 54 (internal quotation marks omitted) (alteration in original).

Even before *Porter* abolished the corroboration rule, *Pierce* had already fallen into disfavor, and it was well established that "a prior inconsistent statement *can* be the sole basis for a guilty verdict." *State v. Lewis*, 431 S.W.3d 7, 12 (Mo. App. E.D. 2014) (emphasis added) (citing *State v. Garner*, 14 S.W.3d 67, 72 (Mo. App. E.D. 1999)). *Pierce* only applied as an exception to that general rule and was "restricted to its unique factual situation." *State v. Duley*, 219 S.W.3d 842, 844 (Mo. App. W.D. 2007) (internal quotation marks and citation omitted); *Lewis*, 431 S.W.3d at 12 ("Its use is also growing increasingly disfavored beyond its limited application such as to the specific facts at issue in *Pierce*.").

We therefore reject Washburn's argument that *Pierce* is somehow applicable to this case. Even if *Pierce* remains good law on its particular facts (which we question), this case

does not fit *Pierce*'s mold. The State did not try to enter Victim's first forensic interview as a prior inconsistent statement but rather as an aural and visual exhibit *that could be considered as substantive evidence under section 492.304*. And again, Victim did *not* recant the statements made during her first forensic interview when she testified at trial. Though she initially could not remember if Watson grabbed her breast, she later testified that she did, in fact, believe that he did so. Therefore, unlike the minor victim in *Pierce* whose trial testimony was "180 degrees opposite of and contradictory to her out-of-court statement,"[11] Victim's testimony at trial *did corroborate* the statements made in her first forensic interview.

Viewing the evidence in the light most favorable to the jury's verdict, substantial evidence supports Washburn's conviction on Count IV.

Point I is denied.

## II.

"A person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years old." § 566.062.1 (Supp. 2013). At the time of the offense, deviate sexual intercourse was defined as "any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person or for the purpose of

---

[11] *State v. Pierce*, 906 S.W.2d 729, 735 (Mo. App. W.D. 1995).

terrorizing the victim."  § 566.010(1).  The State was therefore required to prove that Washburn touched Victim's genitals with his hand for the purpose of gratifying his sexual desire.

In his second point on appeal, Washburn takes issue with the "sexual gratification" element of the State's case as it relates to Count III.  He argues there was insufficient evidence that Washburn touched Victim's vagina for his own sexual gratification because Victim testified that she was unsure if Washburn was awake or asleep during the incident, leaving the jury to "speculate" about whether Washburn consciously touched her.  Again, we disagree.

"In assessing whether a defendant touched another for the purpose of arousing or gratifying the sexual desire of any person, a jury may infer intent from the surrounding circumstances or from the sexual nature of the act itself."  *State v. Schneider*, 678 S.W.3d 493, 505 (Mo. App. E.D. 2023) (internal quotation marks omitted).

Ample evidence supports the jury's verdict on Count III.  Victim stated in her second forensic interview that she woke facing the wall with Washburn's body positioned along her back with his hand down her underwear.  Victim stated that Washburn then "scooted" his hand down until his hand was all the way in her underwear up to his wrist and that Washburn was cupping her vagina.  Victim further stated that she had a recollection of Washburn removing his hand from her vagina *and then putting it back on her vagina* before Victim fell back to sleep.

The jury could reasonably infer from this testimony that Washburn touched Victim's vagina for his own sexual gratification from the sexual nature of this touching

16

alone. *Ray v. State*, 564 S.W.3d 771, 780 (Mo. App. W.D. 2018) ("Touching a woman's vagina is an inherently sexual act, which can alone serve as evidence of Defendant's intent to arouse or gratify either his or her sexual desire.") (internal quotation marks omitted).

Washburn's multiple hand movements (i.e., scooting his hand over her vagina and later replacing his hand over her vagina once again) also support an inference that he was awake and touching Victim's vagina for his own sexual gratification. *See State v. Ganzorig*, 533 S.W.3d 824, 831 (Mo. App. E.D. 2017) (holding that jury could infer a vaginal touching was not an "accident" where the defendant touched the victim's vagina twice).

Moreover, the jury could infer that this element was met from Victim's testimony of the surrounding circumstances. Victim stated in her second forensic interview that on the afternoon before the vaginal touching occurred, Washburn took her out on the golf cart and talked to her about men wanting to do sexually explicit things to her, including licking her genitals. Victim said Washburn was trying to teach her a lesson and pointed out girls he wanted to "lick." Victim stated that a few days later, Washburn made Victim "show" her "boobs" and "butt." Victim also stated that Washburn offered her $200 to "lick her pussy" while she was sleeping. Victim testified at trial that it was this last incident that "affirmed everything in [her] mind that he wasn't asleep when he did what he did to [her] the first time when [she] woke up with his hand in [her] pants, and that it was intentional."

17

Based on Washburn's behavior before, during, and after the incident, the jury could draw reasonable inferences—just as Victim did after Washburn offered her payment to sexually assault her while she was sleeping—that he was conscious and acting with purpose when he touched Victim's vagina. *State v. Hooper,* 552 S.W.3d 123, 137 (Mo. App. S.D. 2018) ("The jury may draw inferences as to a defendant's intentions and motives from the defendant's conduct before the act, during the act[,] and after the act.") (internal quotation marks omitted) (alteration in original; *State v. Schuler*, 563 S.W.3d 157, 159 (Mo. App. S.D. 2018) (applying *Hooper* to sexual abuse claim).[12]

Crediting all evidence and reasonable inferences in support of the jury's verdict and disregarding all evidence and inferences to the contrary, the record before us substantially supports Washburn's conviction under Count III.

Point II is denied.

**Standard of Review for Point III**

The trial court 'has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion.'" *State v. Ratliff,* 622 S.W.3d 736, 744 (Mo. App. W.D. 2021) (quoting *State v. Hartman*, 488 S.W.3d 53, 57 (Mo. banc 2016)). "A trial court abuses its discretion when its 'ruling admitting or excluding evidence is clearly against the logic of the circumstances then

---

[12] *See also Binion v. State,* 649 S.W.3d 359, 366-67 (Mo. App. E.D. 2022) (affirming conviction on appeal where child victim awoke to defendant's hand on his bare genitals and defendant "bear hugging" him from behind even where victim and defendant both testified that defendant was asleep at the time given the very sexual nature of the act itself).

18

before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (quoting *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016)).

### III.

Washburn argues in his third point on appeal that the trial court erred in excluding Cousin's testimony that would have called into question Mother's credibility as a witness.

"Evidence must be logically and legally relevant to be admissible." *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* (internal quotation marks omitted). "Evidence is legally relevant when the probative value of the evidence outweighs unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *State v. Taylor*, 466 S.W.3d 521, 528 (Mo. banc 2015) (internal quotation marks omitted). The balancing of the probative value and prejudicial effect of evidence rests within the sound discretion of the trial court. *State v. Williams*, 922 S.W.2d 845, 852 (Mo. App. E.D. 1996).

A witness's credibility is generally always relevant in a lawsuit, but "attacks on a witness's credibility in a criminal proceeding are subject to limitations, and not every attack[] will be permitted." *State v. Donovan*, 539 S.W.3d 57, 71 (Mo. App. E.D. 2017). Similarly, while "[a] defendant in a criminal case has a constitutional right to present a complete defense," *State v. Miller*, 372 S.W.3d 455, 472 (Mo. banc 2012), "the due process clause does not require the admission of irrelevant evidence . . . . [Or] require the

19

admission of all relevant evidence," *State v. Copeland*, 928 S.W.2d 828, 837 (Mo. banc 1996) (internal citations omitted) (overruled on other grounds by *Joy v. Morrison*, 254 S.W.3d 885, 888 n.7 (Mo. banc 2008)).

"When contradiction evidence is sought to be used for impeachment purposes, it [is] not admissible if the contradiction relates to a collateral matter." *Taylor*, 466 S.W.3d at 530. "A matter is considered to be collateral if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed." *Id.* (internal quotation marks omitted).

"A trial court's exclusion of an offer of impeachment on an immaterial or collateral matter does not constitute an abuse of discretion," *State v. Mann*, 23 S.W.3d 824, 835 (Mo. App. W.D. 2000) (internal quotation marks omitted), and such exclusions are "not fundamentally unfair if the appellant had the opportunity to thoroughly cross-examine the witness whose testimony was to be impeached," *Donovan*, 539 S.W.3d 57 at 71 (internal quotation marks omitted) (citing *State v. Simmons*, 515 S.W.3d 769, 775 (Mo. App. W.D. 2017)).

Here, Cousin testified in her offer of proof that Mother and Father tried to convince Cousin that she was sexually assaulted by Washburn. Cousin further testified that she was not sexually assaulted by Washburn. Washburn attempted to introduce this evidence to show that *Mother* was not a credible witness. But Mother's credibility regarding her and Father's conduct toward Cousin was in no way materially significant for proving or disproving the contested fact at issue: whether *Victim*'s allegations against Washburn were credible. The trial court therefore did not abuse its discretion in

20

excluding Cousin's offer of proof because it involved a collateral matter—Mother's credibility.

Moreover, defense counsel had the opportunity to thoroughly cross-examine Mother, Father, and Victim on the same topics and credibility issues relating to Cousin's offer of proof.

Washburn contends that in "she-said/he-said" cases "Missouri law allows a party to introduce extrinsic evidence to attack a witness's credibility by demonstrating their bad character for truth and veracity, citing to *State v. Long*, 140 S.W.3d 27 (Mo. banc 2004) and *Mitchell v. Kardesch*, 313 S.W.3d 667 (Mo. banc 2010). This precedent does not alter our analysis.

The cases cited by Washburn dictate that extrinsic evidence should only be allowed to impeach credibility in *unusual* situations where the witness's credibility is materially significant for deciding the central issues in the case and the introduction of extrinsic evidence is more probative than prejudicial. *See Long*, 140 S.W.3d at 30 (explaining that extrinsic evidence can be used to attack the prosecuting witness where that witness's testimony is "a key factor in determining guilt or acquittal"); *Kardesch*, 313 S.W.3d at 682 ("In cases involving character of the witness for truth and veracity, it will be the unusual case where that balancing weighs in favor of admission of extrinsic evidence.").

As detailed above, *Mother's* character for truthfulness was not a central issue for the fact finder. *Victim* was the State's key witness. And while *Victim's* credibility for truth and veracity was certainly relevant for proving Washburn's guilt, Cousin's offer of

21

proof *did not put Victim's truth or veracity at issue*. Cousin's offer of proof was only

admissible as contradiction evidence, and the trial court did not abuse its discretion in

excluding it because it involved a collateral matter. *Donovan*, 539 S.W.3d at 71 ("A trial

court's exclusion of an offer of impeachment on an immaterial or collateral matter does

not constitute an abuse of discretion.").[13]

Point III is denied.

---

[13] Cousin's offer of proof also presented significant potential for collateral confusion on unrelated acts of misconduct because it would have set up a "mini-trial" on whether Cousin was actually sexually abused by Washburn. Such "mini-trials" are exactly what Missouri's general prohibition on the use of extrinsic evidence seeks to avoid. *See State v. Long*, 140 S.W.3d 27, 30 (Mo. banc 2004) ("The bar on extrinsic evidence of prior, specific acts of misconduct furthers the general policy focusing the fact-finder the most probative facts and conserving judicial resources by avoiding mini-trials on collateral issues.").

The trial court acknowledged this concern and indicated that, if it allowed Cousin's offer of proof that Washburn *did not* sexually assault her, that testimony would open the door to propensity evidence that had been previously excluded, including testimony of other relatives who claimed Washburn *did* sexually abuse them. In the trial court's words, Cousin's testimony would have gotten into "who's done what to whom and when and what the allegations are."

Thus, even if we assume *arguendo* that Mother's credibility was minimally probative on the issue of Washburn's guilt, the trial court's reasoning that Cousin's testimony should be excluded because it would unduly prejudice Washburn and distract the jury by opening the door to "mini trials" on propensity evidence *that his counsel fought to exclude*, is not "against the logic of the circumstances."

## Conclusion

The trial court's judgment is affirmed.

_____
Mark D. Pfeiffer, Judge

Edward R. Ardini, Presiding Judge, and Cynthia L. Martin, Judge, concur.